PARTIDO SOCIALISTA PUERTORRIQUEÑO, demandante y apelante, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y apelado.

*Número:* O-78-338         *Resuelto:* 5 de octubre de 1978

*Juan Mari Brás, Ludmilia Rivera Burgos* y *Carlos Gallisá,* abogados del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Miguel A. Pagán,* abogado Departamento de Justicia, abogados del Estado Libre Asociado; *Héctor Luis Acevedo,* abogado del Partido Popular Democrático.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal. (*)

---

(*) NOTA DEL COMPILADOR: Por entender que es de interés general, se publica a continuación de la opinión disidente del Juez Asociado Señor Martín, 107 D.P.R. 634, dos resoluciones interlocutorias dictadas antes de emitirse la opinión, con fechas 21 y 27 de septiembre de 1978, respectivamente. En la primera, actuando en auxilio de su jurisdicción, el Tribunal prohibió el uso de propiedades y fondos públicos y la intervención de la Comisión Estatal de Elecciones y de funcionarios o empleados públicos en las elecciones internas del grupo de ciudadanos afiliados a un partido de los Estados Unidos a que se refiere la opinión. En la segunda, el Tribunal aclaró que la prohibición en la resolución anterior no se extiende al uso de las escuelas públicas autorizado por la Ley Núm. 94 de 30 de junio de 1975, 18 L.P.R.A. sec. 126a.

El 27 de abril de 1978 el Partido Socialista Puertorriqueño presentó en el tribunal de instancia una demanda de sentencia declaratoria e interdicto contra el Estado Libre Asociado, la Comisión Estatal de Elecciones y otros. Alegaba en ella, entre otros hechos, que los demandados estaban realizando gestiones, con cargo a fondos del erario de Puerto Rico y con personal de esa Comisión, para organizar, administrar y realizar la elección interna del Partido Demócrata de Estados Unidos en Puerto Rico, tentativamente fijada para celebrarse el 1 de octubre de 1978; que el propósito de esta elección interna es constituir un comité local de la referida agrupación para coordinar, en conjunción con la dirección nacional de dicho Partido Demócrata de Estados Unidos, la elección de delegados a la convención nacional del mencionado partido, en la cual se nominan sus candidatos para la presidencia y vicepresidencia de Estados Unidos; que el Partido Demócrata de Estados Unidos no es un partido político puertorriqueño; que en Puerto Rico no se vota ni por el presidente ni por el vicepresidente de Estados Unidos, y que la utilización de fondos públicos y personal del Estado Libre Asociado con el propósito descrito equivale a utilizar fondos públicos para fines privados y es contraria a la Constitución del país.

La representación del Estado Libre Asociado solicitó treinta días de prórroga para contestar y el 1 de junio de 1978 radicó una moción de desestimación en que alegó, en esencia, que el apelante no tiene capacidad para demandar; que el caso no es justiciable, por plantear una cuestión política, y que el demandante no expone hechos que constituyan una causa de acción. Varios días más tarde presentó el Ministerio Público su contestación, en que de hecho niega la existencia de infracción constitucional alguna.

El 14 de junio de 1978 el abogado a cargo en el Departamento de Justicia informó que a partir del 29 de tal mes se encontraría fuera de Puerto Rico disfrutando sus vacaciones. Se quejó el demandante de que fuesen a permitirse dilaciones

que convirtiesen el caso en académico. El 27 de junio el Ministerio Público señaló que a su entender gozaba de 60 días a partir de la contestación para iniciar los procedimientos de descubrimiento de prueba en el recurso. El Tribunal Superior se negó a permitir descubrimiento de prueba en la etapa alcanzada por los procedimientos. El Ministerio Público solicitó luego, el 20 de julio, treinta días para refutar la oposición radicada por el demandante a la moción de desestimación del Estado. Entrado agosto se puso finalmente al Tribunal Superior en posición de resolver la referida moción de desestimación, la que fue declarada con lugar, junto a otras análogas de otros demandados, y archivada en autos el 12 de setiembre de 1978.

El 13 de setiembre acudió en alzada el apelante a este Tribunal Supremo. Dos días más tarde, hallando que este recurso plantea una cuestión sustancial, el Tribunal les requirió a las partes la radicación de alegatos simultáneos el 20 de setiembre, mucho antes del tiempo reglamentario, y señaló una vista oral para el 21 de setiembre. Escuchadas las partes, este Tribunal expidió el mismo día, por voto unánime de sus miembros, la resolución interlocutoria siguiente en auxilio de nuestra jurisdicción:

"Plantea este recurso esencialmente si el uso de fondos y propiedades públicos para las elecciones internas de un grupo de ciudadanos afiliados a un partido de los Estados Unidos viola o no la sección 9 del artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico.

"Oídas las partes en vista oral y examinados el expediente y los alegatos, el Tribunal reconoce la existencia de una cuestión constitucional substancial que requiere sereno y detenido estudio antes de llegar a una decisión. Considerando que la fecha señalada para la elección interna del 1 de octubre de 1978 no fue fijada por ley ni se nos ha demostrado que su posposición afectaría los propósitos de la Ley Núm. 102 de 24 de junio de 1977, el Tribunal, en auxilio de su jurisdicción y por el tiempo que tome la decisión de este recurso, prohíbe el uso de propiedades y fondos públicos y la intervención de la Comisión Estatal de Elecciones, del Administrador General de Elecciones y de todo otro

funcionario o empleado del Estado Libre Asociado de Puerto Rico en la promoción, administración, dirección y celebración de la referida elección interna."

El recurso de autos plantea diversas cuestiones constitucionales noveles en esta jurisdicción y otras que ya han sido objeto de comentario por este Tribunal. La decisión del recurso exige que nos expresemos sobre la capacidad del apelante para demandar, la existencia de una controversia adjudicable por los tribunales, el significado de la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, relativa a la disposición de propiedades y fondos públicos, y el impacto sobre este litigio de otras disposiciones de la referida Constitución.

1. *La capacidad del apelante para demandar.*

■ El Tribunal Superior concluyó acertadamente que el Partido Socialista Puertorriqueño es un partido político con plena capacidad para demandar. Esta determinación de la ilustrada sala sentenciadora halla apoyo en nuestras decisiones en *Salas Soler* v. *Srio. de Agricultura,* 102 D.P.R. 716 (1974) y *Zachry International* v. *Tribunal Superior,* 104 D.P.R. 267 (1975). El derecho del apelante a impugnar legislación que a su entender lesiona sus intereses como partido político y aun como grupo general de ciudadanos es manifiesto. *Asociación de Maestros* v. *Pérez, Gobernador Int.,* 67 D.P.R. 849 (1947); *Cerame-Vivas* v. *Srio. de Salud,* 99 D.P.R. 45 (1970); Davis, *The Liberalized Law of Standing,* 37 U. Chi. L. Rev. 450 (1970).

2. *La naturaleza justiciable de este litigio.*

■ La interpretación definitiva de la Constitución y las leyes es función tradicional e ineludible de las cortes. Las otras ramas del gobierno no pueden constituirse en los jueces finales de sus propios poderes. *The Federalist,* Núm. 78 (Alexander Hamilton); *Baker* v. *Carr,* 369 U.S. 186, 211 (1962); *Bond* v. *Floyd,* 385 U.S. 116, 131 (1966); *United States* v. *Nixon,* 418 U.S. 683, 703 (1974). En vista de este rasgo de

nuestro ordenamiento jurídico es posible que surjan en ocasiones conflictos de interpretación entre las ramas gubernamentales. Ello no justifica la evasión por las cortes de su responsabilidad constitucional. *Powell* v. *McCormack*, 395 U.S. 486, 548-549 (1969). Como expresamos en *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977), sobre un problema análogo al que aquí se plantea:

"La función de ser intérprete final de la Constitución le corresponde ... a un solo poder, al Poder Judicial."

Contrario al planteamiento del apelado, el Tribunal Supremo de Estados Unidos ha afirmado, *Baker* v. *Carr*, 369 U.S. 186, 209 (1962):

". . . El mero hecho que el pleito busca la protección de un derecho político no quiere decir que el mismo presenta una cuestión política."

El historial del Art. VI, Sec. 9, de la Constitución del Estado Libre Asociado de Puerto Rico, el que repasaremos dentro de breve, recalca el significativo papel a desempeñarse por el Poder Judicial en la interpretación de los términos de esta disposición.

3. *El significado del Art. VI, Sec. 9, de la Constitución del Estado Libre Asociado de Puerto Rico.*

El Art. VI, Sec. 9, de la Constitución del Estado Libre Asociado de Puerto Rico provee:

"Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley."

Esta disposición es de carácter autóctono. Las antiguas cartas orgánicas, las leyes Foraker y Jones, no contenían una disposición análoga, como tampoco la Constitución de Estados Unidos. La Escuela de Administración Pública de la Universidad de Puerto Rico, que sometió diversos estudios a la consideración de la Convención Constituyente, no abordó el tema. Véase: Escuela de Administración Pública, *La Nueva Consti-*

*tución de Puerto Rico,* ed. U.P.R., 1954. Si bien diversas constituciones estatales contienen cláusulas parecidas, (1) la Sec. 9 del Art. VI arranca de la Proposición Núm. 182 presentada a la Asamblea Constituyente por seis miembros de la Comisión de la Rama Legislativa y otro delegado. El Art. 18 de la referida propuesta disponía:

"(18) Los fondos públicos solo podrán destinarse a fines públicos y los desembolsos se harán por autoridad de ley."

La Comisión de la Rama Legislativa incorporó esta idea a su Informe de 7 de diciembre de 1951, cuyo Art. 22 proveía, en modo aún más tajante:

"22. Los fondos públicos solo serán destinados a fines públicos y para el mantenimiento y sostenimiento de las instituciones del Gobierno, y no se considerarán instituciones del Gobierno ni fines públicos aquellos que no estén bajo la autoridad e intervención del Gobierno. Todo desembolso de fondos públicos se hará por autoridad de ley." 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico* 2587.

La Comisión de la Carta de Derechos recomendaba también que se tratase este asunto, pero se convino que ésta era materia a examinarse principalmente por la Comisión de la Rama Legislativa. 2 *Diario,* supra, 903. La propuesta general que se debate resulta ser en tal forma la de esta última Comisión.

El debate arroja luz sobre importantes extremos. En primer término se consigna el sentir de la Convención sobre la función del poder judicial respecto a esta cláusula. El porta-

---

(1) Véanse, entre otras, las siguientes, Louisiana, art. VII, sec. 10(D); Carolina del Norte, art. V, sec. 2(1); Carolina del Sur, art. XI, sec. 2; Tejas, art. VIII, sec. 3; California, art. IV, sec. 22; Colorado, art. V, sec. 34; Delaware, art. VIII, sec. 8; Nueva Jersey, art. VIII, sec. 2(2); Nueva York, art. VII, sec. 8; Idaho, art. VIII, sec. 2; Ohio, art. VIII, sec. 4; Pennsylvania, art. VIII, sec. 8; Washington, art. VIII, sec. 5; Wisconsin, art. VIII, sec. 3, y Wyoming, art. XVI, sec. 6. Se advertirá que hay notables diferencias entre el texto de muchas de estas constituciones y la nuestra. La de Louisiana es la más similar. En este sentido debe emplearse con cuidado la lista que aparece en *Notes and Comments,* Washington, 1952, pág. 104, n. 7, ya que no vienen al caso algunas de las citas.

voz del grupo mayoritario en la Asamblea expresó su convicción de que

". . . esta limitación del artículo 22, no debe pasar de la palabra 'gobierno' . . . ponerse ahí un punto. . . . Y dejar materia de definiciones, en cuanto a lo que es 'fines públicos e instituciones públicas' al poder judicial, de acuerdo con la expresión y declaración legislativa, inicialmente, al aprobarse una ley y luego por la interpretación que el poder judicial haga de esta constitución, en relación con la legislación que esté interpretando, y evitarnos el peligro de amarrar la situación . . . haciendo definiciones en el texto de la constitución." 2 *Diario* 903.

Se combatió esta posición por el fundamento de que se estaba sancionando una práctica indeseable de acudir a los tribunales en todo momento que se exigiese una definición, 2 *Diario* 904, 906, pero eventualmente prevaleció la expresión citada. 2 *Diario* 2441.

No existe indicio en el historial de intención alguna de revestir a la Asamblea Legislativa de poder exclusivo o de un poder tan extenso para determinar lo que sirva a un fin público que reduzca a un rito más ceremonial que sustantivo la función revisadora de los tribunales en estos casos. El debate a que hemos aludido revela, por el contrario, que la Convención estaba depositando en el poder judicial amplias facultades de interpretación de esta cláusula específica, aún más amplias que las simplemente derivables de nuestro sistema de separación de poderes. Esta conclusión cobra fuerza si se examina la totalidad del informe de la Comisión de la Rama Legislativa y el puesto que se le asigna en él al Art. 22, la disposición que nos ocupa. El Art. 22 es parte del propósito de la Comisión de crear un mejor sistema de fiscalización de cuentas, ingresos y utilización de recursos. Sec. XI del Informe de la Comisión de la Rama Legislativa, 4 *Diario*, 2587–2588. Es natural que en estas circunstancias se desease que el poder judicial, con toda la deferencia que deben merecerle y le merecen las actuaciones de las otras ramas del go-

bierno, no adopte una actitud pasiva al pasar juicio sobre la legalidad, a distinción de la sabiduría, de una asignación.

■ La línea divisoria entre lo que les corresponde o no hacer a los tribunales al ejercer su función bajo la cláusula invocada es de fino trazado. Dentro de nuestro esquema constitucional es incuestionable que las cortes deben ejercer con mesura su poder, que no deben arrogarse los que no tienen y que el criterio de otros cuerpos gubernamentales sobre la extensión de los suyos debe normalmente acarrear considerable peso. Como expresamos en la sección anterior de esta opinión, no obstante, el árbitro supremo de la Constitución es el poder judicial y esta facultad es ineludible e indelegable. Dado el historial de la cláusula bajo estudio y las condiciones de nuestra economía, la facultad de definir lo que constituye un fin público ha de ejercerse por las cortes con particular celo dentro de los parámetros constitucionales que impone la doctrina de separación de poderes.

■ Otras partes del debate sobre la Sec. 9 del Art. VI ayudan a desentrañar el significado de la frase clave "fines públicos". Varios delegados expresaron su preocupación con la amplitud del lenguaje propuesto por la Comisión de la Rama Legislativa por estimar que pudiese impedir "la cooperación del gobierno con fondos o propiedades públicas a otras empresas que no son instituciones sectarias." 2 *Diario* 905. Otro delegado afirma que "estoy en contra de esta proposición, por entender que todavía restringe más las facultades del gobierno para ayudar a los fines públicos. Y yo entiendo que cuando una institución, una sociedad, ayuda a resolver un problema del gobierno, no debe exigirse que esa institución esté bajo la autoridad e intervención del gobierno." 2 *Diario* 904. Se alude a la deseabilidad de "la posible cooperación con instituciones de carácter semipúblico que cooperan con el gobierno a resolverle problemas sociales, como el Instituto contra el Cáncer y otras organizaciones análogas que puedan existir u organizarse en el futuro." 2 *Diario* 905–906. De la

totalidad del extenso debate y de la enmienda que eventualmente se acuerda para eliminar, como había sugerido originalmente el portavoz de la mayoría, la frase de que "no se considerarán instituciones del Gobierno ni fines públicos aquellos que no estén bajo la autoridad e intervención del Gobierno" se deducen las conclusiones siguientes: a) es posible la asignación de fondos públicos a entidades semipúblicas o aun privadas que cumplan una función reconocidamente pública; b) el propósito de tales entidades debe ser colaborar en el desempeño de una labor gubernamental; y c) la asignación no puede infringir otras disposiciones de la Constitución del Estado Libre Asociado, tales como la prohibición contra el uso de propiedades o fondos públicos para fines sectarios o el sostenimiento de instituciones educativas que no sean las del Estado (Art. II, Sec. 5), la igual protección de las leyes (Art. II, Sec. 7) y la invasión de derechos pertenecientes al pueblo en una democracia (Art. II, Sec. 19).

En vista de estas consideraciones examinemos el problema de si la asignación de fondos públicos hecha por la Resolución Conjunta Núm. 17 de 30 de junio de 1978, en relación con la Ley Núm. 102 de 24 de junio de 1977, está permitida por la Constitución del Estado Libre Asociado.

4. *El Preámbulo de la Constitución y la caracterización del fin.*

El Ministerio Público argumenta que el propósito de la asignación impugnada es de orden público porque lo que se persigue es garantizar el derecho de los puertorriqueños a seleccionar y elegir candidatos a la presidencia y vicepresidencia de Estados Unidos, conforme se consigna en la exposición de motivos de la mencionada Ley Núm. 102. Este planteamiento exige que analicemos la naturaleza del Preámbulo de nuestra Constitución y la validez de su utilización para sostener la asignación impugnada.

La parte del Preámbulo en que se apoya el Procurador General es la que expresa

"Que consideramos factores determinantes en nuestra vida la ciudadanía de los Estados Unidos de América y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas . . . ."

Luego de citar esta frase, la Ley Núm. 102 afirma en su Exposición de Motivos:

"Uno de esos derechos es el de nominar los candidatos a la Presidencia y Vicepresidencia de los Estados Unidos . . . .

Es, pues, el propósito de esta ley, garantizar al pueblo puertorriqueño la mayor participación en la elección de sus delegados a la convención de los Partidos Nacionales, para nominar los candidatos a Presidente y Vicepresidente de los Estados Unidos por medio del sufragio igual, directo y secreto."

La asignación de fondos que efectúa la Resolución Conjunta Núm. 17 de 30 de junio de 1978, dentro del esquema de la Ley Núm. 102, obedece al deseo de sufragar los gastos de unas elecciones internas de una agrupación local afiliada al Partido Demócrata de Estados Unidos para escoger los delegados que luego han de seleccionar los representantes de este partido en Puerto Rico.

El historial de la citada frase del Preámbulo revela que su significado y propósito es distinto al que le adscribe el Procurador General y la propia Ley Núm. 102. La frase no formaba parte del texto recomendado por la Comisión de Preámbulo, Ordenanzas y Procedimientos de Enmiendas a la Constitución. 4 *Diario* 2553–2557. La historia de su interpolación ofrece la clave de su sentido. El texto final del Preámbulo fue el producto de un largo e intenso debate entre las fuerzas en contienda en la Convención Constituyente. No pueden interpretarse sus términos fuera de ese contexto histórico.

Varios delegados a la Convención sostenían que debía consignarse en el Preámbulo la aspiración del pueblo puertorriqueño a la estadidad. En la Proposición Núm. 68, presentada por el señor Luis A. Ferré, se consignaba que "es la aspiración suprema del pueblo de Puerto Rico, alcanzar la plena igualdad en unión permanente e indisoluble con el pueblo de

Estados Unidos de América como un estado más de la Unión Americana." En muchas otras propuestas tales como las número 36, 60, 68, 81, 103, 115, 150 y 311 se repetía la misma idea aunque a veces en lenguaje menos explícito. Así, por ejemplo, el señor Miguel A. García Méndez favorecía en la Prop. Núm. 81 que en el Preámbulo constasen frases tales como:

"Nosotros, el pueblo de Puerto Rico, formado por sinceros y leales ciudadanos americanos cuya aspiración política máxima es compartir, en condiciones de igualdad, todos los derechos y todos los deberes que tienen y desempeñan sus conciudadanos americanos . . . [y] cimentar la felicidad de los puertorriqueños mediante la unión permanente e indisoluble con los Estados Unidos de América, bajo cuya bandera aspiramos a disfrutar eventualmente de la completa igualdad en la dignidad de la ciudadanía con un status de carácter irrevocable . . . ."

La Comisión de Preámbulo consideró y rechazó todas estas propuestas. 4 *Diario* 2553 y ss.

Al debatirse en la Asamblea Constituyente el informe de la Comisión de Preámbulo ocurrió el siguiente hecho significativo. Un delegado propuso que se enmendase el Preámbulo para que donde se utilizaba la palabra "unión" se insertase a continuación el vocablo "permanente". 2 *Diario* 1127. El presidente de la Comisión de Preámbulo se opuso a la enmienda en los siguientes términos, 2 *Diario* 1128:

"Yo me voy a oponer a la enmienda . . . . Yo, personalmente, según es de conocimiento público, favorezco la unión permanente de Puerto Rico en el gran conglomerado democrático de los Estados Unidos de América . . . .

Sin embargo, creo que una de las demostraciones y de las expresiones más necesarias a la buena práctica de la democracia, es dar cumplimiento a lo que se le ha dicho al pueblo cuando se le ha invitado a votar, aunque ese cumplimiento no esté, en alguno de sus extremos, con la opinión personal de alguno de nosotros.

Este es el caso en cuanto a la enmienda que ocupa nuestra atención en estos momentos. Fue claramente expresado ante el pueblo por este delegado que habla y por otros delegados . . . que

no era la intención cerrar puertas a ningún desarrollo del porvenir, aunque algún desarrollo del porvenir no tuviere nuestra aprobación personal."

Tras prolongado debate se derrotó la enmienda por votación de setenta y dos a trece. 2 *Diario* 1154.

Inmediatamente después de esta votación el señor García Méndez propuso una enmienda en que, entre otros conceptos, decía:

". . . bajo cuya bandera [la de Estados Unidos] aspiramos a disfrutar de la completa igualdad en la dignidad de la ciudadanía, con un *status* de carácter irrevocable . . . ." 2 *Diario* 1155.

El señor Ferré argumentó en la siguiente forma a favor de la enmienda:

". . . Para nosotros, los representantes del Partido Estadista en esta Asamblea Constituyente, no hay duda en cuanto a cuál debe ser nuestra posición y cuál debe ser nuestra orientación en todo aquello que se refiera a la definición del *status* político de Puerto Rico. Para nosotros solamente existe el mandato de que este documento deje expedito el camino para conseguir la estadidad para Puerto Rico, si no puede, en alguna forma, dejar establecida la aspiración en forma mandatoria, para que Puerto Rico se convierta en un estado de la Unión Americana . . . ." 2 *Diario* 1169.

Un delegado combatió la enmienda, expresando:

". . . lo que se ha estado pretendiendo hasta este momento en esta sala es que esta constitución, que esta Convención Constituyente concurra al pueblo de Puerto Rico, produciendo como única y exclusiva alternativa y posibilidad para su vida la alternativa y la posibilidad de la estadidad.

Y le quiero decir a mis compañeros estadistas que esta pretensión y esta exigencia no tiene justificación alguna ni puede tampoco sostenerse . . . ." 2 *Diario* 1186.

La enmienda fue derrotada. 2 *Diario* 1196.

Días más tarde el señor Ferré propuso que luego de la referencia en el Preámbulo a la unión con los Estados Unidos se intercalase la frase "en la igualdad de derechos y respon-

sabilidades". 3 *Diario* 1907. Se derrotó la enmienda, la que recibió únicamente seis votos a favor. *Loc. cit.* El señor García Méndez intentó entonces que se adoptase el Preámbulo de la Prop. Núm. 103, que repetía en otras palabras el tema de su enmienda anterior. Tampoco fue aceptada esta enmienda. 3 *Diario* 1908.

Dos días antes de terminar sus trabajos la Convención Constituyente hubo gestiones de acercamiento para lograr un lenguaje aceptable a las partes en contienda. 4 *Diario* 2485. El resultado fue la aprobación de una enmienda consistente en que después de la frase "Que consideramos factores determinantes en nuestra vida la ciudadanía de los Estados Unidos de América", se añadió el lenguaje en que tanto se apoya la Ley Núm. 102:

"y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas." 4 *Diario* 2485.

¿Significaba esta adición que se estaba aceptando la tesis de la minoría, tantas veces rechazada en multidad de versiones, sobre la necesidad de fijarle un rumbo determinado al futuro desarrollo político del país, cerrándole puertas a todo otro tipo de desenvolvimiento? No fue tal el sentir mayoritario, según surge claramente del récord. El propio señor García Méndez, proponente formal de la enmienda adoptada, afirmó que no pretendía conseguir que se incluyera en la Constitución la aspiración de la estadidad, por cuanto no era dable suponer que los delegados del sector mayoritario desearan incluir en la Constitución el programa del partido de la minoría. Concluyó el orador señalando que la Constitución propuesta permitía al menos, sin embargo, que la minoría pudiese entender que se enfilaba al país por la ruta de la estadidad. 4 *Diario* 2363.

■ La intención de la mayoría y no de las minorías es el elemento básico para determinar el significado de una

constitución o una ley y el señor García Méndez, con cumplido escrúpulo, señaló en la declaración que antecede(²) que su interpretación correspondía a la de un grupo minoritario en la Asamblea Constituyente. Aun así el presidente de la Comisión de Preámbulo se apresuró a aclarar, 4 *Diario* 2364, que ningún concepto que expresase aspiración en el texto de la Constitución debía interpretarse como que solo quedaban las puertas abiertas para desarrollos en cierta dirección específica.

En expresiones posteriores se recalcó que la interpolación bajo examen no entrañaba preferencia alguna por un *status* específico ni obligaba a que futuros cambios ocurriesen dentro del marco de determinada fórmula política. También se aclaró que el disfrute de los derechos y prerrogativas de la ciudadanía de Estados Unidos puede lograrse por medios distintos a los de la estadidad federada. 4 *Diario* 2491.(³)

---

(²) Su texto exacto fue el siguiente:

". . . Creo que estamos todos contestes en que el partido en que milita el que os habla no podría pretender conseguir que se incluyera en este documento la aspiración de la estadidad, en pelo, como comúnmente se dice, por cuanto no podríamos tener la presunción de que vosotros, compañeros de la mayoría, propusierais el programa del partido de la minoría. Pero yo entiendo que . . . encauzado ahora el problema político, podemos incluir esta enmienda que, desde nuestro punto de vista—como una minoría de éste, en esta Convención—no nos incluye la estadidad pero nos enfila por la ruta de la estadidad." 4 *Diario* 2363.

(³) Dos miembros de la facción minoritaria principal radicaron votos explicativos en que reiteraban su particular interpretación de lo añadido al preámbulo. 4 *Diario* 2482, 2494. Otro miembro de ese mismo grupo criticó el Preámbulo por incluir "una variedad de expresiones altisonantes cuya inteligencia y enrevesada significación no sólo demuestran una inexactitud ante la historia, si[no] que son antagónicas entre sí . . . ." 4 *Diario* 2386. Otro sector minoritario radicó un voto explicativo en que expresaba su entendido de que la constitución aprobada:

"No contiene declaración alguna que cierre la puerta a ninguna aspiración relativa a lo que debiera ser nuestro *status* político final. En todas las discusiones o debates se ha hecho bien claro que—si bien se reafirma nuestra asociación con Estados Unidos . . . cuando Puerto Rico desee . . . podrá decidir por los votos de sus habitantes, si desea continuar su asociación con el pueblo de los Estados Unidos, cambiando de *status* y convir-

■ De todo lo anterior se deducen las conclusiones siguientes:

1. La Constitución del Estado Libre Asociado no cierra puertas a ningún cambio de *status* que el pueblo de Puerto Rico desee ni consagra el programa político de ningún partido sobre la naturaleza de tales posibles cambios.

2. El propio sector mayoritario de la Asamblea se abstuvo de consignar su compromiso sobre la permanencia de la asociación o unión con Estados Unidos. Con más razón se negó a aceptar propuestas que enfilasen el destino político del país hacia rumbos fijados en los programas de otros partidos. La Constitución de Puerto Rico no comprometió en medida alguna el futuro político del país.

3. La Constitución del Estado Libre Asociado quiso diseñar un esquema que dejase libre a todo ciudadano para propulsar y defender sus propias ideas sobre el destino final de nuestro pueblo. No puede invocarse la Constitución de Puerto Rico como apoyo para paso alguno que incline o aparente inclinar la balanza, a juicio de otros sectores de opinión, hacia determinado tipo de *status*.

4. El Preámbulo de la Constitución de Puerto Rico es, en fin, un documento neutral en materia de desarrollos futuros concernientes al *status*. No constituye base legal adecuada para resolver que la asignación de fondos para financiar un posible desarrollo de tal naturaleza es para fines públicos. De no ser así y ser por el contrario cierta la posición del Procurador General, ¿qué impediría que pudiesen asignársele fondos a una entidad privada para promover la estadidad? ¿No sería esto, de aceptarse tal posición, la manera más efectiva de cumplir "la aspiración a continuamente en-

---

tiéndose en un estado federado, o si desea convertirse en una república libre y soberana, separada de los Estados Unidos.

"No hemos comprometido el futuro de Puerto Rico, y nos reservamos el derecho a decidirlo cuando las circunstancias lo demanden . . . ." 4 *Diario* 2372.

riquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas?"

Las conclusiones reseñadas, así como el historial en que se fundan y otras partes del mismo que citaremos dentro de breve, revelan la existencia de una dificultad aún más profunda que afecta la validez de los actos impugnados. La discutimos a continuación.

5. *La facultad de la Asamblea Legislativa para legislar sobre el status.*

Hemos visto como el presidente de la Comisión de Preámbulo recalcó que al pueblo de Puerto Rico se le dijo por él y otros delegados que la Constitución a redactarse no cerraría caminos a ningún desarrollo del porvenir. 2 *Diario* 1145. La Convención Constituyente no recibió mandato alguno a favor de resolver el *status* de Puerto Rico o de encaminarlo en determinada dirección. El programa del Partido Popular Democrático no solicitó que se facultase a la Convención a resolver el problema del *status* o aun para lanzarlo definitivamente por determinado cauce. Para la copia de este programa, véase: *El Mundo*, 11 de agosto de 1951. El Partido Socialista tampoco requirió que se invistiese a la Convención Constituyente de este poder. *Notes and Comments*, Washington, 1952, pág. 24. El Partido Independentista rehusó postular candidatos y participar en la Convención, precisamente por considerar que esta carecía de la autoridad necesaria para tomar una determinación sobre el destino político del país. Anderson, R. W., *Gobierno y Partidos Políticos de Puerto Rico*, Ed. Tecnos, Madrid, 1970, págs. 128–129. ([4])

---

([4]) El Partido Estadista lo recabó en la elección de delegados a la Asamblea. En el programa adoptado el 5 de agosto de 1951 se incluyó el compromiso de considerar la Constitución como un instrumento de gobierno "dirigido a llevar al pueblo puertorriqueño hacia la igualdad en la dignidad de la ciudadanía, o sea, hacia la estadidad . . . ." *El Mundo*, 6 de agosto de 1951. El Partido Estadista logró elegir tan solo quince delegados contra setenta del Partido Popular Democrático y siete del extinto Partido Socialista, fundado por Santiago Iglesias. Pagán, B., *Historia de los Partidos Políticos Puertorriqueños*, II, 305.

Estamos claramente ante una reserva de poder al pueblo de Puerto Rico. Era a la ciudadanía en sí y no a sus representantes en la Convención Constituyente y menos a una Asamblea Legislativa futura que se le estaba reconociendo la facultad de pasar juicio sobre cualquier género de modificación sustancial a su *status* político.

El tratamiento del problema del *status* en las últimas décadas abona esta conclusión. La propia Ley Núm. 600 de 3 de julio de 1950, 64 Stat. 314, iniciadora del proceso que lleva a la redacción de la Constitución del Estado Libre Asociado, no se sujetó a la aprobación o rechazo de la Asamblea Legislativa, sino al resultado de un referéndum entre todos los electores de Puerto Rico. La Constitución, una vez redactada, se sometió al mismo proceso. Para mayor claridad, la Convención Constituyente expresó en el tercer apartado, inciso (e), de su Resolución Núm. 23 que "El pueblo de Puerto Rico retiene el derecho de proponer y aceptar modificaciones en los términos de sus relaciones con los Estados Unidos de América . . . ."

Los proyectos de modificaciones sustanciales al *status* sometidos desde entonces al Congreso o al Presidente de Estados Unidos por el Gobierno de Puerto Rico condicionaron su vigencia a su aprobación o rechazo por el pueblo de Puerto Rico. Así sucedió con el proyecto Fernós-Murray de 23 de marzo de 1959, H.R. 5926, 86° Cong., 1ª Ses.; con el proyecto para enmendar el margen prestatario del país, Ley Pública 87–121 de 3 de agosto de 1961, 75 Stat. 245; con el proyecto Aspinall, H.R. 5945, 88° Cong., 1ª Ses. (30 de abril de 1963), y con el proyecto de Pacto de Unión Permanente entre Puerto Rico y Estados Unidos, remitido el 1 de octubre de 1975 al Presidente Ford, *Compact of Permanent Union Between Puerto Rico and the United States, Report of the Ad Hoc Advisory Group on Puerto Rico*, October, 1975, pág. 46. Aun la redacción de este documento no se emprendió excepto después de la consulta plebiscitaria de 1967 y conforme a sus resul-

tados. Véase la Carta Constitutiva del Comité. *Ibid.*, 83–84, 85–86.

Lo ocurrido con el voto presidencial también ilustra el reconocimiento de esta reserva de poder a favor del pueblo de Puerto Rico. El Grupo Asesor Ad Hoc sobre el Voto Presidencial para Puerto Rico recomendó el 18 de agosto de 1971 "que se conceda el derecho a votar por el Presidente y el Vicepresidente de los Estados Unidos a todos los ciudadanos de los Estados Unidos residentes en Puerto Rico que reúnen las cualificaciones normalmente requeridas . . . ." Se recomendó al mismo tiempo, sin embargo, "que se celebre un referéndum para determinar si la mayoría del electorado en Puerto Rico desea votar por los dos funcionarios federales que nos representan a todos, no solamente a una parte de la ciudadanía." *Presidential Vote for Puerto Rico, Report of the Ad Hoc Advisory Group on the Presidential Vote for Puerto Rico,* August, 1971, pág. 33. No tuvo éxito el intento posterior de obtener que la Asamblea Legislativa autorizase la celebración de este plebiscito.

Es al pueblo de Puerto Rico, por tanto, a quien corresponde entender directamente en la decisión de su destino político final o en la aprobación de medidas que afecten de modo importante sus relaciones con Estados Unidos. La Asamblea Legislativa del país tiene facultad para disponer plebiscitos no discriminatorios sobre tales medidas o sobre la cuestión general del *status.* La asignación de fondos para tales fines constituye indudablemente una asignación de fondos para fines públicos. La Asamblea Legislativa está desprovista de poder, sin embargo, para legislar en zonas reservadas al pueblo de Puerto Rico, tales como la relativa al voto presidencial, a menos que el pueblo la autorice expresamente. Una asignación de fondos para fines no autorizados no solamente infringe la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, sino también la Sec. 19 del Art. II, relativa a los derechos pertenecientes al pueblo. La asignación

de fondos efectuada por la Res. Conj. Núm. 17 de 30 de junio de 1978 invade una zona vedada a la autoridad legislativa.(⁵)

En consideración a que podría argumentarse, con razón o sin ella, que la asignación en este caso se limita a financiar una actividad interna de una agrupación afiliada a un partido de Estados Unidos, sin que técnicamente se encuentre ante este foro el asunto del voto presidencial, prosigamos el análisis de si tal uso de los fondos públicos cumple con los criterios consignados en la tercera parte de esta opinión.

6. *La distinción entre partidos políticos y agrupaciones para fines políticos.*

Los partidos políticos son elemento básico de toda democracia. C. J. Friedrich, *Constitutional Government and Democracy*, 4ᵃ ed., 1968, pág. 430 y ss. Son las vías mediante las cuales se canalizan pacíficamente las distintas tendencias políticas y económicas de la sociedad en un momento dado. *Fuster* v. *Busó*, 102 D.P.R. 327, 347 (1974) y autoridades allí citadas. R. Young, *American Law and Politics*, ed. 1967, pág. 67; V. O. Key, *Politics, Parties, and Pressure Groups*, 5ᵃ ed., 1964, pág. 200. Los partidos políticos realizan funciones cuasigubernamentales, tales como formular programas de administración y proponer candidatos a puestos políticos. El desempeño de estas funciones es indispensable para el sistema político. Note, *Primary Elections: The Real Party in Interest*, 27 Rutgers L. Rev. 298, 303 (1974). Es por ello que se justifica, por perseguir un fin público, la asignación de fondos públicos para financiar primarias y otras actividades propias de las funciones de los partidos puertorriqueños *bona fide. Ibid.*, 304; *cf. Buckley* v. *Valeo*, 424 U.S. 1, 85–109 (1976). Hay que distinguir, sin embargo, entre los

---

(⁵)La existencia de este problema de reserva de poder, ausente en la jurisprudencia norteamericana, convierte el examen de esta en ejercicio estéril. El caso de *McCormick* v. *Marrero, Juez*, 64 D.P.R. 260 (1944), es inaplicable a la controversia actual por la misma razón y por obedecer a criterios establecidos en otro campo y antes de la adopción de la Constitución del Estado Libre Asociado.

partidos políticos locales, que dentro de las normas fijadas por nuestra legislación electoral colaboran en la vital tarea de elegir periódicamente el gobierno del país y aquellas agrupaciones políticas que no cumplen tal propósito. La agrupación envuelta en este caso interesa participar más bien en la selección de unos delegados quienes a su vez elegirán a cuatro representantes al Comité Nacional del Partido Demócrata de Estados Unidos. La entidad favorecida con la asignación de fondos en este caso no es un partido político puertorriqueño ni sirve o complementa, dentro de los criterios discutidos, un fin gubernamental. Es cierto que persigue propósitos que interesan a muchos puertorriqueños, pero es cierto también que existe gran división en la comunidad puertorriqueña sobre la sabiduría de sus fines. No existe un objetivo general de pueblo, como se ha demostrado, que le imprima carácter público a sus fines, como no lo existiría tampoco en el caso de una asociación dedicada a la reforma del Estado Libre Asociado o al reconocimiento de la independencia.

Las conclusiones alcanzadas hacen innecesario que nos pronunciemos sobre otros problemas que plantea este recurso bajo la Constitución del Estado Libre Asociado. ([6])

*Por las consideraciones expuestas se revoca la sentencia recurrida, se declara inconstitucional la Res. Conj. Núm. 17 de 30 de junio de 1978, por infringir la Sec. 9 del Art. VI y la Sec. 19 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, y se convierte en permanente el interdicto expedido en auxilio de su jurisdicción por este Tribunal el 21 de setiembre de 1978.*

El Juez Asociado Señor Negrón García concurre con dicho resultado en opinión separada. Los Jueces Asociados Señores Dávila y Martín disintieron en opiniones separadas.

---

([6]) Véase, por ejemplo, la consideración del problema de igual protección de las leyes que se efectúa en la ponencia del Juez Asociado, Señor Antonio S. Negrón García.

—o—

Opinión concurrente del Juez Asociado Señor Negrón García.
San Juan, Puerto Rico, a 5 de octubre de 1978

Si bien este recurso versa sobre un trasfondo eminente-
mente político, en el orden jurídico presenta, como contro-
versia medular, el ámbito y medios de autoridad de la Asam-
blea Legislativa para constitucionalmente ampliar el alcance
del voto del elector puertorriqueño frente al principio de la
esencial igualdad en la reglamentación de ese derecho y el uso
de fondos y propiedad pública para esos fines.

I

*Antecedentes Procesales—*

Ante la apelación interpuesta, este Tribunal el 15 de sep-
tiembre de 1978, en consideración a la cuestión constitucional
sustancial planteada y resuelta por el Tribunal Superior,
Sala de San Juan, en 7 de septiembre de 1978—desestimando
la demanda de *injunction* y sentencia declaratoria presentada
por el Partido Socialista Puertorriqueño (P.S.P.), alegando
en síntesis la inconstitucionalidad de la Ley Núm. 102 de 24
de junio de 1977, conocida como "Ley de Primarias Presiden-
ciales Compulsorias" por el fundamento de carecer el Go-
bierno de Puerto Rico de ". . . autoridad constitucional para
asignar fondos públicos y supervisar unas elecciones internas
de un partido que no es un partido electoral en Puerto Rico
y en el que los ciudadanos puertorriqueños están impedidos
de votar por candidatos a puestos públicos que se postulan y
que han de ser electos en sus convenciones" (¹)—requirió ale-
gatos y fijó una vista oral solicitando de las partes concen-
traran sus argumentos en torno a: (a) si la asignación de
fondos públicos hecha por la Resolución Conjunta Núm. 17
de 30 de junio de 1978 en relación con la Ley Núm. 102 de

_____

(¹) Véase pág. 1 de la Resolución del Tribunal Superior, Sala de San
Juan, desestimando la demanda.

24 de junio de 1977, y el uso de facilidades y personal gubernamental que contempla dicha Ley Núm. 102, infringía la Sec. 9 del Art. VI de la Constitución de Puerto Rico; y (b) las posibles medidas, que en auxilio de su jurisdicción, podrían adoptarse para evitar que el recurso se convirtiera en académico, antes de que el Tribunal pudiera pronunciarse, tras el necesario estudio y deliberación, sobre los planteamientos jurídicos suscitados.

Celebrada dicha vista, dictamos unánimemente la siguiente Resolución interlocutoria:

"Considerando que la fecha señalada para la elección interna del 1 de octubre de 1978 no fue fijada por ley ni se nos ha demostrado que su posposición afectaría los propósitos de la Ley Núm. 102 de 24 de junio de 1977, el Tribunal, en auxilio de su jurisdicción y por el tiempo que tome la decisión de este recurso, prohíbe el uso de propiedades y fondos públicos y la intervención de la Comisión Estatal de Elecciones, del Administrador General de Elecciones y de todo otro funcionario o empleado del Estado Libre Asociado de Puerto Rico en la promoción, administración, dirección y celebración de la referida elección interna.

El ámbito de esta prohibición provisional incluirá la utilización por persona alguna de cualquier propiedad adquirida o por adquirir con fondos públicos."

Posteriormente, mediante moción suscrita el 25 de septiembre, el Procurador General de Puerto Rico nos solicitó esclareciéramos si la transcrita Resolución comprendía el uso de escuelas públicas autorizado en la Ley Núm. 94 de 30 de junio de 1975. El día 27 de dicho mes, nuevamente por unanimidad, expresamos que nuestro dictamen no contemplaba tal prohibición.

## II

*Fondos Públicos y Gastos Gubernamentales—*

El párrafo 9 del Art. VI de la Constitución establece: "Solo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de

ley." Antes de su aprobación, interpretamos el concepto *fin público*, en el caso de *McCormick* v. *Marrero, Juez,* 64 D.P.R. 260, 267 (1944):

"La Legislatura tiene amplia discreción para determinar que es lo que constituye un fin público y para tomar aquellas medidas que a su juicio promuevan el bienestar de la comunidad. No es función de los tribunales la de expresar opinión sobre la sabiduría o conveniencia de una medida legislativa. Si ésta contiene elementos de beneficio público *y el propósito que se trata de realizar es de carácter público,* la cuestion en cuanto al beneficio que haya de recibir el público *debe ser resuelta por la Legislatura y no por los tribunales* . . . ." (Bastardillas nuestras.)

De inmediato advertimos los requisitos que deben concurrir al pasarse juicio sobre la legitimidad de una asignación legislativa de "fondos públicos", a saber: contemple un beneficio público (promover el bienestar e interés público de la comunidad); estén destinados a una actividad de carácter público o semipúblico (en contrastes con una privada); su destinatario esté sujeto a intervención gubernamental; y sean asignados por ley. Sobre el particular "en repetidos casos se ha resuelto que las frases 'fondos públicos' y 'dineros públicos' tienen el mismo significado y se han usado indistintamente en las leyes y en la jurisprudencia para expresar lo mismo . . . ."—*Pueblo* v. *Pérez,* 47 D.P.R. 765, 779 (1934). El requisito de que "sean asignados *por ley*", va más allá del simple acto de aprobación formal parlamentaria para conceptualizar y exigir un estricto marco de legalidad *per se* en la asignación. Puede que la designación de fondos corresponda incuestionablemente a un fin revestido de interés público, pero que por otras razones esté huérfana del elemento de legalidad expuesto, lo cual anularía la juridicidad del mandato legislativo.

Respecto a la frase "fin público", los foros judiciales no han intentado formular una definición exacta y general del ámbito que comprende. El concepto o término abunda en las leyes y casos, pero por su naturaleza dinámica resiste una

definición precisa la cual no es susceptible de reducirse a una fórmula absoluta con abstracción de las realidades cambiantes en una sociedad. En consecuencia, el enfoque ha sido más bien pragmático, por lo que de ordinario han limitado su dictamen a detectar la existencia o no de un *fin público* a la luz del trasfondo fáctico y jurídico presente en cada controversia. Tal actitud se fundamenta en el respeto y deferencia que merece a los tribunales el sentir legislativo basado en un reconocimiento de que ello es una función básicamente parlamentaria, sujeta únicamente al escrutinio judicial allí donde se evidencia claramente que la determinación es arbitraria, ilegal o discriminatoria. *P.R. Telephone Co.* v. *Tribl. Contribuciones*, 81 D.P.R. 982 (1960); *Mathews* v. *De Castro*, 429 U.S. 181, 185 (1976); *Helvering* v. *Davis*, 301 U.S. 619 (1937); *Carmichael* v. *Southern Coal and Coke Co.*, 301 U.S. 495 (1937).

Este enfoque quedó plasmado en los debates de la Convención Constituyente. A tal efecto, el delegado Sr. Gutiérrez Franqui palmariamente expuso sus propósitos: "[D]ejar materias de definiciones, en cuanto a lo que es 'fines públicos e instituciones públicas' *al poder judicial,* de acuerdo con la expresión y declaración legislativa, inicialmente, al aprobarse una ley *y luego por la interpretación que el poder judicial haga de esta constitución, en relación con la legislación que esté interpretando,* y evitarnos el peligro de amarrar la situación . . . ." 2 *Diario de Sesiones de la Convención Constituyente de Puerto Rico,* 903; Edición 1961. (Bastardillas nuestras.) Hecha esta aclaración, la enmienda propuesta por el delegado, Sr. Reyes Delgado, sosteniendo prevaleciera la norma entonces existente que excluía el asunto de la esfera de interpretación judicial, fue derrotada. *Op. cit.,* 906.

Es ineludible concluir que el caso de *McCormick,* supra, en lo referente a limitar el ámbito de intervención del Poder Judicial quedó modificado por la Constitución. Al presente, aun cuando la determinación del Poder Legislativo sobre lo que constituye fines públicos es objeto de seria y respetuosa

consideración, es materia justiciable perteneciente al foro judicial evaluar la realidad y validez constitucional de dicha expresión en cada caso particular. La naturaleza del uso, sea público o privado, en última instancia es una controversia judicial—*Hairston* v. *Danville & W. R. Co.*, 208 U.S. 598 (1908)—ya que no es concebible que un "fin público" advenga a vida porque las autoridades públicas, por *fiat*, así lo determinen.

El marco conceptual democrático y de moralidad que informa la prohibición de fondos públicos para fines privados, fue expuesto por el delegado constituyente, Sr. Leopoldo Figueroa al expresar ". . . que los fondos públicos [. . .] proceden de recaudaciones públicas, que proceden de los tributos que se imponen a *todas las clases,* que proceden de rentas que obtiene el tesorero de *todos los hombres y mujeres de todos credos, de todas filiaciones, . . . no es sana política que esos fondos públicos* sean manejados por instituciones privadas en las cuales no tenga intervención el gobierno." *Op. cit.,* 913–914. (Bastardillas nuestras.)

Con este marco de referencia, examinemos la Ley Núm. 102 denominada *Ley de Primarias Presidenciales Compulsorias* de 24 de junio de 1977. En términos generales establece un sistema de primarias obligatorias en Puerto Rico para la selección de delegados a participar en las convenciones de los partidos nacionales norteamericanos en el proceso de nominación de candidatos a la presidencia y vicepresidencia; define conceptos, reglamenta los trámites internos, impone penas por violar sus disposiciones y asigna fondos. Mediante la Ley Núm. 1 y la Resolución Conjunta Núm. 17, de 7 y 30 de junio de 1978, respectivamente, se confirió taxativamente intervención al Administrador de la Comisión Estatal de Elecciones para dirigir, supervisar e implementar las primarias y se asignaron para sufragar gastos los $600,000.00 cuestionados en esta apelación.

Su exposición de motivos recoge el ánimo que movió a la Legislatura:

"El Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico establece como factor determinante de nuestra vida 'la ciudadanía de los Estados Unidos y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas.' *Uno de esos derechos es el de nominar candidatos a la Presidencia y Vicepresidencia de los Estados Unidos.* Los Puertorriqueños han estado participando en las Convenciones Nacionales de los Partidos Nacionales por casi medio siglo. Sin embargo, no ha existido hasta este momento una ley que garantice la más amplia participación de los puertorriqueños, como ciudadanos americanos, en la selección de los delegados que nos representan en las convenciones de los Partidos Nacionales para la nominación de candidatos a la Presidencia y Vicepresidencia de los Estados Unidos.

En el pasado los delegados a dichas Convenciones Nacionales han sido seleccionados mediante el procedimiento conocido como caucus, el cual no permite la participación amplia de todos los ciudadanos interesados. Permitir la continuación del sistema de caucus para seleccionar los delegados de Puerto Rico a las Convenciones Nacionales, frustraría la política pública vigente que tiende a darle al ciudadano la mayor participación posible en los procesos democráticos.

Es, pues, el propósito de esta ley, *garantizar al pueblo puertorriqueño la mayor participación en la elección de sus delegados a la convención de los Partidos Nacionales, para nominar los candidatos a Presidente y Vicepresidente de los Estados Unidos por medio del sufragio igual, directo y secreto.*" (Bastardillas nuestras.)

Por su particular relevancia a la solución del caso que nos ocupa, es menester destacar las siguientes definiciones:

"*Partido Nacional*—Es aquel que nomina y asiste en la elección de candidatos al cargo de Presidente y Vicepresidente de los Estados Unidos de América"; "*Partido Político Afiliado*—Es aquel partido político bajo esta ley que haya solicitado afiliación a un Partido Nacional y haya sido reconocido como tal por dicho partido"; y "*Primarias Presidenciales*—Proceso electoral mediante el cual [se] eligen delegados y se endosan candidatos a la presidencia y vicepresidencia en los Partidos Nacionales."

El historial legislativo de dicha ley refleja además—aunque no se consignó en el texto final aprobado—un interés de evitar incidentes de violencia asegurando el orden y paz social en la ventilación de las controversias de aquellos ciudadanos que se estiman acreedores al reconocimiento oficial y poder de endoso de los aspirantes a los primeros puestos ejecutivos en los Estados Unidos por el Partido Demócrata Nacional. (Texto Votación Final del Senado correspondiente al 24 de marzo de 1977.)

En resumen, mediante la Ley Núm. 102, *supra*, se intenta reglar, sufragar y suplir la maquinaria gubernamental al proceso de selección interna de delegados a la Convención del Partido Demócrata Nacional con miras a evitar violencia y darle mayor participación a los simpatizantes de dicho partido. *La premisa que nutre el estatuto es que la condición de ciudadanía americana entraña un derecho absoluto a votar por el presidente y vicepresidente de los Estados Unidos.*

Con este breve trasfondo, formulamos la siguiente interrogante: ¿Puede sostenerse que el desembolso autorizado de $600,000.00 en virtud de la Resolución Conjunta aprobada en 30 de junio de 1978, y la intervención de la Comisión Estatal de Elecciones en el proceso interno que nos ocupa, es constitucional?

A manera de prólogo consignamos que no es necesario elaborar una discusión sobre si las elecciones internas o primarias del Partido Demócrata Nacional, es o no un asunto que genere interés público en el Puerto Rico contemporáneo y que reclama la atención de un número sustancial de ciudadanos. A los fines de esta ponencia así lo admitimos. También somos de opinión que no nos corresponde expresarnos, en ninguna capacidad, sobre la sabiduría o buen juicio del desembolso desde el punto de vista de otras prioridades a la luz de los múltiples problemas y necesidades que agobian a la sociedad puertorriqueña, cuestión que es atributo exclusivo de la Rama Legislativa. Nuestro análisis se circunscribirá y girará sobre la legalidad o inconstitucionalidad de la ley,

según ha sido impugnada—en virtud de los señalamientos sobre ausencia de autoridad legislativa e infracción a la cláusula de igual protección de las leyes—conforme a la estructura constitucional electoral vigente.

Nuestra posición sobre la validez o no de este gasto e intervención gubernamental quedó intimada y resumida mucho antes de que surgiera la presente controversia en ocasión del voto concurrente y disidente emitido en el caso de *Democratic Party* v. *Tribunal Electoral*, 107 D.P.R. 1, 25, 39 (1978), en que en lo pertinente expresamos lo siguiente:

"Lo expuesto no resuelve todas las interrogantes planteadas en el caso pues el recurrente argumenta la inconstitucionalidad de la decisión y además que:

'El *Democratic Party of Puerto Rico* no existe ni ha existido jamás como un partido electoral *bona fide*. Ha sido especialmente desde 1944, un frente del Partido Popular Democrático para participar a medias en la política nacional estadounidense a la vez que evita la afiliación formal de este último, que le crearía serios problemas divisionistas dentro de su grey, mayoritariamente autonomista y contraria a dicha afiliación. Su inscripción cada cuatro años como partido local en Culebra responde precisamente a la intención de 'proteger' ese nombre y la insignia nacional del burro para así *evitar* que cualquier grupo, en el libre ejercicio de su derecho de asociación, se inscriba y se afilie al Democratic National Committee *para así participar de buena fe en las elecciones en Puerto Rico* y en la nominación del Presidente y Vice-Presidente de Estados Unidos.

*Es contrario al interés público proteger la existencia de una ficción jurídica específicamente para evitar el ejercicio del derecho de asociación política.*

El Código Electoral rige el proceso electoral en Puerto Rico. *El proceso de inscripción de nombres e insignias y la certificación de partidos se refieren a agrupaciones que se proponen participar en el proceso electoral.'*

Nos señala, además, que en ningún momento dicha agrupación alegó o admitió propósito electoral alguno.

El Tribunal Electoral en una Resolución fechada el 24 de diciembre de 1975 determinó que el *Democratic Party of Puerto*

*Rico* era un partido *bona fide*. Sin embargo, es obvio que aun aceptando la corrección de dicha conclusión para aquella época, *el carácter 'bona fide' tendría que determinarse a la luz de las ejecutorias que logre en sus gestiones de inscripción post-electorales*. Para fines de esta ponencia, *hemos de asumir* al presente que tanto el *Democratic Party of Puerto Rico* como el recurrente *Democratic Party* son agrupaciones que *bona fide desean participar en nuestras elecciones del 1980, independientemente de las relaciones y consecuencias que ello pueda tener en los procesos internos de nominación de candidatos a la Presidencia y Vicepresidencia por el Partido Demócrata Nacional en los Estados Unidos*. El Código Electoral derogado—único que rige la situación de autos—en lo que respecta a la franquicia de partidos políticos, y la correspondiente tutela de nombres e insignias electorales, *se basa en la premisa de que éstos participarán real y efectivamente en la selección local y general de los funcionarios a puestos públicos electivos; no contempla que el único propósito sea el monopolizar nombres e insignias o el convertirse en instrumentos para participar indirectamente en la elección de funcionarios no locales cuyo derecho no está reconocido constitucional ni legislativamente al presente en Puerto Rico.*" (Bastardillas nuestras.)

Los argumentos expuestos por las partes en sus alegatos y en la vista oral, nos mueven a reiterar dicha posición. A la luz de las alegaciones de la demanda(2) y la certificación de

---

(2) La ilustrada Sala sentenciadora resume correctamente el estado del derecho vigente cuando se evalúan los méritos de una moción de desestimación: "Al considerar tal moción el Tribunal debe aceptar como ciertos y correctos todos los hechos bien alegados en la demanda pudiendo admitir prueba y debiendo penetrar más allá de las meras alegaciones. (*Sierra, Sec. Trabajo* v. *Bird*, 78 D.P.R. 170 (1955); *Dobbins* v. *Hato Rey Psychiatric Hospital*, 87 D.P.R. 30 (1962) y *Cervecería Corona, Inc.* v. *Tribunal Superior*, 99 D.P.R. 698 (1971).)

" 'Debe desestimarse en definitiva porque no aduce causa de acción sólo cuando la razón de pedir no procede bajo supuesto alguno de derecho concebible, y por lo tanto, la misma no es susceptible de ser enmendada.' (*Figueroa* v. *Tribunal Superior*, 88 D.P.R. 122, 124 (1963) y *Rivera Rivera* v. *Trinidad*, 100 D.P.R. 776 (1972).) O sea, al resolver la moción hay que considerar si a la luz de la situación más favorable para el demandante la misma es suficiente para contener una reclamación válida, solo procediendo la desestimación cuando se desprenda con toda certeza que no tiene derecho a remedio alguno bajo cualquier estado de hechos que puedan probarse en

no participación del Partido Demócrata de Puerto Rico ha quedado *prima facie* establecido que los desembolsos de fondos públicos serán realizados para supervisar la designación de un comité local del ". . . Partido Demócrata de Estados Unidos [que] no es un partido puertorriqueño, no ha postulado en el pasado ni tiene el propósito de postular candidatos para los cargos electivos que dispone la Constitución y las Leyes de Puerto Rico para las elecciones de 1980 en Puerto Rico."

El carácter presuntivo de partidos políticos *bona fide*—con aspiraciones legítimas de postular candidatos para las elecciones generales del país—que le atribuimos a las dos facciones disputándose nombres e insignias en nuestra ponencia en el caso de *Democratic Party* v. *Tribunal Electoral*, supra, ha quedado destruido. El nombre no hace la cosa. Aunque en la ley se denominen partidos políticos afiliados, en su correcta perspectiva se trata más bien de agrupaciones de ciudadanos que interesan participar en la selección de unos delegados que elegirán a su vez cuatro representantes para que formen parte del Comité Nacional del Partido Demócrata de los Estados Unidos. Este Comité, en última instancia, decidirá quién será nominado para las elecciones referente a los cargos de Presidente y Vicepresidente de dicha nación. El Partido Nacional Demócrata no ostenta ni goza de franquicia electoral en nuestro país lograda mediante el trámite inicial de inscripción exigido en la Ley Electoral a los partidos políticos puertorriqueños. El concepto *partido político afiliado* a uno nacional, acuñado en la Ley de Primarias Presidenciales Compulsorias, es extraño al bosquejo y diseño constitucional vigente. "Desde tiempo inmemorial se ha dicho que una *elección para un puesto público* no es nada más ni menos que la expresión por *electores cualificados* de su candi-

---

apoyo de su reclamación. (*Reyes* v. *Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970), y *Boulon* v. *Pérez*, 70 D.P.R. 988 (1950).)

"Al hacer nuestra determinación debemos considerar los interrogatorios y contestaciones a ellos que obran en autos y toda la prueba documental que las partes presentaron, en este caso el demandante PSP."

dato preferido." *United States* v. *Classic*, 313 U.S. 299, 318 (1941). (Bastardillas nuestras.)

Por circunstancias particulares en la relación política prevaleciente, que no nos corresponde examinar, ni nuestra Constitución ni la de los Estados Unidos[3] reconocen el derecho a que los electores de Puerto Rico voten por los candidatos a dichos cargos públicos. En otras palabras, no somos electores cualificados para votar con relación a dichos cargos ejecutivos federales. ¿Podría la Asamblea Legislativa otorgar dicha cualidad? Al presente nuestra fuente de poder político y público ". . . emana del pueblo y se ejercerá con arreglo a su voluntad, *dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América.*" (Art. I, Sec. 1 Constitución.) *R.C.A.* v. *Gobierno de la Capital*, 91 D.P.R. 416 (1964). En lo que respecta al poder de la Legislatura para disponer todo lo concerniente al proceso electoral y ampliar el contenido y atributo de un voto creando cargos electivos, esta autoridad política se extiende solamente a nuestra Isla y aquellas adyacentes dentro de su jurisdicción.

---

[3] El derecho a votar por el Presidente corresponde a los estados federados en virtud de lo dispuesto en la Sec. 1, del Art. II de la Constitución de los Estados Unidos. Sobre el particular, véanse Rosenthal, *The Constitution, Congress, and Presidential Elections*, 67 Mich. L. Rev. 1 (1968), y *Presidential Electors*, 153 A.L.R. 1066. El Tribunal Supremo federal ha resuelto que los electores presidenciales no son agentes ni funcionarios federales, sino que actúan por autoridad del estado, el cual a su vez deriva su poder de la cláusula federal antes mencionada—*Ray* v. *Blair*, 343 U.S. 214 (1951)—la cual no es aplicable a Puerto Rico. En *Whitcomb* v. *Chavis*, 403 U.S. 124 (1971) se dijo: "La línea de casos desde *Gray* v. *Sanders*, 372 U.S. 368 (1963) y *Reynolds* v. *Sims*, 377 U.S. 533 (1964), hasta *Kirkpatrick* v. *Preisler*, 394 U.S. 526 (1969), y *Wells* v. *Rockefeller*, 394 U.S. 542 (1962), reconocen que 'un gobierno representativo es en esencia gobierno propio a través de representantes del pueblo, elegidos, y cada ciudadano tiene el derecho inalienable a participar cabal y efectivamente en el proceso político de los cuerpos legislativos estaduales'."

Tanto un proceso de primarias como una elección general están protegidas bajo la constitución norteamericana ya que forman parte integrante del método de elección presidencial y candidatos al Congreso: *Gray* v. *Sanders*, supra; *Smith* v. *Allwright*, 321 U.S. 649 (1944) ; *Phoenix* v. *Kolodziejski*, 399 U.S. 204 (1970).

Excepto el puesto de Comisionado Residente en Washington, los resultados de unos comicios electorales en el país tienen alcance constitucional y jurídico insular (Art. VI, Sec. 4, Constitución), y no extraterritorial.

El ingrediente medular tutelado en el voto de todo elector—de carácter universal, igual, directo, secreto y libre de coacción, según proclamado en la Sec. 2 del Art. II de la Carta de Derechos—y como corolario, el obtener colectivamente una franquicia electoral como medio de garantizar la expresión de la voluntad de un pueblo, presupone que ese voto, en última instancia, será ejercitado y tendrá realmente un valor y eficacia en la elección de determinados candidatos a puestos públicos. Desprovisto de esa característica, ingrediente, consecuencia y valor, subsiste solamente como expresión privada, sin que le acompañe un efecto político-público fuera de las latitudes, jurisdicción o fronteras en que se desenvuelve el cuerpo político soberano.

La validez que hemos admitido en materia de fondos y subsidio electoral—*P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741 (1976)—no alcanza a agrupaciones de ciudadanos privados cuyo propósito exclusivo sea designar delegados para fines internos de un partido nacional.

El diseño constitucional electoral existente en Puerto Rico no lo autoriza. La Asamblea Legislativa no puede por *fiat* extender credenciales ni *status* de partido político a agrupaciones cuyos integrantes no tienen el derecho a votar por unas posiciones ejecutivas a nivel federal en los Estados Unidos independientemente de la sabiduría o no de dicho fin. Tal actuación carece del elemento consustancial e imprescindible soberano del cual dimana un poder público de esta naturaleza. La Ley Núm. 102 es un mecanismo extraconstitucional negativo de los axiomas antes apuntados.

Estas circunstancias a juicio nuestro despojan el carácter público de la empresa y destruyen la validez y legalidad de la asignación y desembolso de los $600,000.00 y el uso de

facilidades y personal de la Comisión Estatal de Elecciones en tales elecciones internas.

Es menester aclarar que este pronunciamiento en nada impide al Estado—en el descargo de su obligación de otorgar protección a toda reunión pacífica de cualesquiera ciudadanos ejercitando su derecho de asociación y expresión—que provea la protección necesaria para evitar actos de violencia como los señalados en el historial de la ley.

## III

*Violación de la Igual Protección de las Leyes—*

Se manifiesta además al caso de autos en varias dimensiones la violación de la cláusula constitucional de igual protección de las leyes consagrada en las Secs. 1 y 2 de nuestra Carta de Derechos. Veamos. Tomamos conocimiento judicial de que en Puerto Rico existen y se debaten básicamente tres pensamientos ideológicos legítimos en cuanto a su destino político como pueblo: la estadidad, autonomía e independencia. Históricamente estos derroteros han formado parte de la aspiración y expresión individual ciudadana, tomado cuerpo colectivo, y previa inscripción, participado como partidos políticos en los procesos eleccionarios generales. También se ha manifestado en consulta plebiscitaria celebrada a los fines de pulsar la opinión pública en determinada época respecto a una redefinición o modificación de las relaciones básicas entre Puerto Rico y los Estados Unidos. *P.P.D.* v. *Ferré, Gobernador*, 98 D.P.R. 338 (1970).

Diluida propiamente la controversia del caso, la realidad expuesta es un punto de vista válido para invocar una desigualdad de tratamiento. En todos estos procesos, por imperativos de unas garantías constitucionales, la ley siempre ha implementado unos mecanismos igualitarios, particularmente en materia de subsidio económico electoral, proveyendo a todo el electorado del país la opción de poder democráticamente expresar en las urnas su predilección sin que se discrimine

contra ninguno de los ideales aludidos. La ejecución de la pieza legislativa que nos ocupa, en lo concerniente al uso de dineros públicos por uno o más grupos de ciudadanos que no ostentan la franquicia electoral, la campaña publicitaria generada por la orientación que la Comisión Estatal de Elecciones debe llevar a cabo, y el hecho de que en su fondo el participar y votar en tales elecciones presupone, proyecta y presenta una vinculación o endoso con los ideales de la estadidad o de asociación autonómica a los Estados Unidos, representa un discrimen y una ventaja—directa e indirecta—de carácter indebido contra aquellos electores independentistas que no coinciden con dichas aspiraciones y otros ciudadanos que propugnan una tesis política contraria. Cualquier otra solución sería un eufemismo judicial y desatendería el único vínculo racional que existe entre la declaración legislativa y el objeto perseguido en la Ley Núm. 102. ¿Cómo es posible exigir a los electores independentistas que hagan su ingreso y voten en un partido político nacional estadounidense como medio de alcanzar una plataforma que les permita viabilizar sus aspiraciones? No existe un mandato mayoritario, expreso y previo que les obligue, producto de un referéndum o plebiscito [4] —en que se le haya dado la oportunidad de votar a favor o en contra a todos los electores capacitados del país—sobre la trascendental decisión de incorporar al proceso eleccionario puertorriqueño—financiado y pagado por todos sus contribuyentes—un reconocimiento a los trámites internos y gestiones de los partidos nacionales de los Estados Unidos con miras a lograr alguna participación colectiva en la nominación de candidatos a presidente y vicepresidente. Ello vulnera el principio igualitario que sirve de fundamento y premisa para

---

[4] Resulta interesante destacar la definición de "Referéndum o Plebiscito" concebida por el legislador en la nueva Ley Electoral, *supra,* en el sentido de que es ". . . el procedimiento mediante el cual *se somete al electorado* del Estado Libre Asociado de Puerto Rico *la aprobación o rechazo de uno o varios asuntos de interés general.*" (Núm. 4 del 20 de diciembre de 1977, Art. 1.003(39)). (Bastardillas nuestras.)

sostener la legalidad de los desembolsos de unos fondos públicos, que no están asequibles a todos en las urnas en lid electoral en que se miden, en igualdad de condiciones, las alternativas ideológicas o decisiones fundamentales que constituyen un cambio o una redefinición de las relaciones básicas entre Puerto Rico y Estados Unidos, según la Constitución vigente. *P.N.P.* v. *Tribunal Electoral*, supra, 751.

Se produce, además, otro discrimen, de carácter dual, contra los electores miembros de partidos políticos principales y por petición puertorriqueños. Primeramente, mientras la Ley Electoral vigente exige a los partidos insulares el que en la elección precedente mantengan o presenten subsiguientemente peticiones de inscripción a base de un cinco por ciento (5%) de fuerza electoral—a los fines de retener u obtener la franquicia(5)—la Ley de Primarias Presidenciales Compulsorias viabiliza la inscripción de un partido político afiliado, grupo de ciudadanos o candidato independiente, a base de presentar solamente peticiones de inscripción equivalentes a un uno por ciento (1%). (Art. 5.) En la práctica se están aplicando dos reglas distintas para nominar electores y partidos políticos colocadas bajo la Constitución en una misma posición.

Y en segundo lugar, mientras la Ley Electoral vigente reconoce a cada uno de dichos partidos la suma de $100,000.00 para gastos anuales en virtud del Fondo Electoral, incluyendo primarias, el viabilizar la elección interna que nos ocupa conlleva e implica la asignación de la cantidad de $600,000.00 en una contienda unilateral. Nadie puede negar que al sufragarse tales gastos, el Estado de hecho está proveyendo un subsidio indirecto a una agrupación que no es un partido político puertorriqueño.

La violación al Partido apelante y a los ciudadanos que lo integran del precepto sobre igual protección de las leyes

---

(5) La franquicia a su vez entraña el derecho y obligación de celebrar primarias financiadas directa e indirectamente con fondos públicos y bajo la supervisión de la Comisión Estatal de Elecciones.

es evidente. Nos reiteramos en cuanto a los términos de la Resolución de este Tribunal fechada 21 de septiembre.

## IV

*Uso de Edificios Escolares—*

Con la misma consciencia judicial que juzgamos y apreciamos la ilegalidad de la asignación de fondos públicos e intervención de la Comisión Electoral en las elecciones privadas en cuestión, concluimos que dicha Resolución no podía impedir que el grupo de ciudadanos, deseosos de participar en los procesos internos del Partido Demócrata de los Estados Unidos con sujeción a la reglamentación pertinente, obtuviera el permiso necesario del Secretario de Instrucción Pública para utilizar las facilidades físicas disponibles con el objetivo de celebrar las actividades deseadas. Esta conclusión nace de un análisis de la Ley Núm. 94, de 30 de junio de 1975 (18 L.P.R.A. sec. 126a). Según su ámbito, las ". . . actividades consideradas de carácter extraordinario [y por ende autorizadas] . . . . serán las siguientes: primarias, asambleas para la organización de partidos . . ." y cobija ". . . a agrupaciones o asociaciones de ciudadanos . . . ."

El historial legislativo demuestra que este precepto fue enmendado en el año 1975 siguiendo las recomendaciones contenidas en un informe de la Comisión de Derechos Civiles para ampliar y permitir el uso de las facilidades de escuelas a toda agrupación de ciudadanos, independientemente de sus ideologías políticas, superándose con ello la posible clasificación de ser discriminatoria y por ende inconstitucional. 2 *Der. Civ.*, págs. 16–22.

A tal efecto, el legajo de la Cámara demuestra:

"El propósito de esta medida es para autorizar al Secretario de Instrucción Pública a conceder el uso de los edificios escolares a agrupaciones o asociaciones de ciudadanos y *a organizaciones con fines políticos para la celebración de reuniones y actividades lícitas.*

La presente medida deroga la Ley Número 4 del 24 de abril de 1961, según enmendada y autoriza al Secretario de Instrucción Pública a conceder el uso gratuito de los edificios escolares, fuera del horario escolar a asociaciones y agrupaciones de ciudadanos y a organizaciones con fines políticos.

Las disposiciones de la presente medida *liberalizan* el uso de los edificios escolares por la ciudadanía para fines legítimos. *El fin es el poner a disposición de organizaciones políticas, y cívicas, el uso de los edificios escolares para toda clase de actividades, reuniones, asambleas y actos de carácter lícito fuera del horario regular.* Dichas actividades no deberán ser para fines de lucro o sectario y tampoco para fines recreativos y de festejos.

*Esta medida es para dar una garantía mucho más amplia al derecho constitucional de libertad de expresión y asociación al proveerles las facilidades físicas de nuestros edificios escolares a las asociaciones y agrupaciones de ciudadanos y organizaciones con fines políticos para que se reúnan en actividades lícitas que no sean con fines lucrativos o de carácter sectario y que no sean con motivos de recreo y festejo."* (Informe Comisión de Instrucción y Cultura sobre el P. del S. 1331 del 24 de mayo de 1975.) (Bastardillas nuestras.)

Y ante el Senado se consignó:

"La Ley Núm. 4 de 24 de abril de 1961, enmendada, que propone derogar el P. del S. 1331, concede el uso gratuito de las facilidades escolares a asociaciones y entidades públicas o privadas reconocidas para la celebración de actividades cívicas y culturales, con la única limitación de que estos no podrán tener carácter político-partidista o sectario ni tener fines lucrativos. Se exceptúa de esta prohibición la celebración de primarias para la selección de candidatos para cargos electivos o cargos en los organismos internos de los partidos políticos.

*El P. del S. 1331 reenacta dicha ley para permitir el uso de tales facilidades a las agrupaciones con fines políticos,* mantiene la prohibición de su uso con fines pecuniarios e inserta una serie de disposiciones para que el Secretario de Instrucción pueda reglamentar su uso debidamente y exigir responsabilidad por su mal uso.

Vuesta Comisión tuvo el beneficio de las ponencias . . . . Todos estuvieron de acuerdo con la aprobación de la medida y sugirieron que se estableciera claramente el poder del Secretario de Ins-

trucción para reglamentar el uso de las facilidades escolares y proteger la propiedad escolar pública, así como el material y equipo dentro de los salones.

*La medida propuesta es más amplia en su contenido y más específica en los poderes que otorga al Secretario de Instrucción para implementar la misma, que la anterior Ley Núm. 4 de 24 de abril de 1961, enmendada, que deroga. Liberaliza el uso de los edificios escolares permitiendo su uso para actos políticos extraordinarios y asuntos de vital importancia para el desarrollo y aplicación de los derechos electorales de la ciudadanía."* (Informe Comisión de Instrucción del Senado, endosado también por la Comisión de Gobierno.) (Bastardillas nuestras.)

Ratificamos el criterio de que nuestra Resolución no contempló el que los interesados usaran las escuelas para fines de sus elecciones internas. No perdemos de vista que podría argumentarse que tal uso violenta la disposición constitucional referente a la forma de disponer de fondos públicos. La proposición no es válida por las siguientes razones: (1) Esta ley no ha sido impugnada por la parte apelante quien circunscribió su alegación a la inconstitucionalidad de la Ley de Primarias Presidenciales Compulsorias y a los desembolsos de fondos públicos e intervención de la Comisión Electoral autorizados; (2) compartimos el criterio que considera que la "cesión en forma esporádica y temporal . . . no constituye una 'disposición de propiedad' dentro del lenguaje de la Ley Fundamental." *Use of School Property*, 94 A.L.R.2d 1274–1293; 68 Am.Jur.2d Secs. 75–76, 422–425; Ops. Sec. Just., Núms. 1962–8 y 1956–53; y (3) plantearía serias interrogantes bajo la proposición de ser discriminatoria y restringir el derecho a la libre asociación y expresión.

## V

Como epílogo, reconocemos las discusiones intelectuales, jurídicas y políticas—serias, histéricas y apasionadas—que generan controversias de esta índole. Como Tribunal colegiado nuestros fallos no están inmunes a la crítica, sea constructiva, sana, injusta o viciosa. No lo pretendemos, y por el contra-

rio, resulta saludable ya que el poder que ejercemos no es privativo sino público. La disposición final de ciertos casos, aunque urgente, requiere una serena reflexión, un ponderado juicio y sobre todo libertad de conciencia judicial. Por ello, merece recordarse que "[c]uando un caso termina, los tribunales están sujetos a las mismas críticas que otras personas; pero no se puede negar la necesidad de evitar interferencia con el curso de la justicia, debido a expresiones prematuras, argumentos o intimidación." Holmes, O. W.: *Patterson* v. *Colorado ex rel. Atty. Gen.*, 205 U.S. 454, 463 (1907).

Concurro con la decisión del Tribunal.

—O—

Opinión disidente emitida por el Juez Asociado Señor Dávila.

San Juan, Puerto Rico, a 5 de octubre de 1978

Respetuosamente disiento. No puedo estar de acuerdo con la opinión del Tribunal. Estamos restringiendo, limitando las facultades de una de las ramas del gobierno. Es verdad que el intercambio habido entre los miembros de la Convención Constituyente revela que la intención fue que el poder judicial definiera la frase "para fines públicos" que aparece en la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico. Pero no es menos cierto que cuando el delegado Gutiérrez Franqui hizo esa expresión conocía nuestro dictamen en *McCormick* v. *Marrero, Juez*, 64 D.P.R. 260, 267 (1944), al efecto de que "[l]a Legislatura tiene amplia discreción para determinar qué es lo que constituye un fin público y para tomar aquellas medidas que a su juicio promuevan el bienestar de la comunidad. No es función de los tribunales la de expresar opinión sobre la sabiduría o conveniencia de una medida legislativa."

Procede examinar lo que expresó el delegado Gutiérrez Franqui:

". . . esta limitación del artículo 22 no debe pasar de la palabra 'gobierno' . . . ponerse ahí un punto. Y dejar materia de defi-

niciones, en cuanto a lo que es 'fines públicos e instituciones públicas' al poder judicial, *de acuerdo con la expresión y declaración legislativa,* inicialmente, al aprobarse una ley y luego por la interpretación que el poder judicial haga de esta constitución, en relación con la legislación que esté interpretando, y *evitarnos el peligro de amarrar la situación* . . . haciendo definiciones en el texto de la constitución." (Bastardillas nuestras.) 2 *Diario de Sesiones de la Convención Constituyente de Puerto Rico,* pág. 903.

Si examináramos detenidamente las palabras del delegado Gutiérrez Franqui veremos que su propósito al proponer que se dejara al poder judicial la definición de "fines públicos e instituciones públicas" fue diametralmente opuesto al propugnado por la opinión del Tribunal. Precisamente lo que propuso el delegado fue que no se incluyera definición alguna del concepto "fines públicos e instituciones públicas" en la Constitución para "evitarnos el peligro de amarrar la situación . . . haciendo definiciones en el texto de la constitución." Es claro que quería evitar que futuras Asambleas Legislativas se vieran impedidas de actuar limitadas por una definición constitucional y no pudieran legislar para resolver los problemas presentes en determinado momento de nuestra historia. Propuso por eso que se dejara al poder judicial la definición del concepto "fines públicos e instituciones públicas" pero "de acuerdo con la expresión y declaración legislativa."

Ciertamente no fue su propósito cerrar el ámbito del poder legislativo en cuanto a lo que constituye "fines públicos e instituciones públicas."Muy lejos de su propósito fue darle al poder judicial la facultad que hoy se abroga y que puede resultar ilimitada y generadora de profundas controversias si tenemos presente que la opinión del Tribunal sostiene "que la Convención estaba depositando en el poder judicial amplias facultades de interpretación de esta cláusula específica, aún más amplias que las simplemente derivables de nuestro sistema de separación de poderes" y que "[e]s natural que en estas circunstancias se desease que el poder judicial, con toda la deferencia que deben merecerle y le merecen las actuacio-

nes de las otras ramas del gobierno, no adopte una actitud pasiva al pasar juicio sobre la legalidad, a distinción de la sabiduría, de una asignación."

Para mí resulta inconcebible que la Convención Constituyente, compuesta en su mayoría por los miembros y líderes de la Asamblea Legislativa, tuviera la intención de restringir los poderes de las Cámaras Legislativas en la forma y manera que propone la opinión del Tribunal. Ciertamente los líderes legislativos que pertenecieron a la Convención Constituyente no hubieran dado su aprobación a una disposición constitucional que ataba las manos del Ejecutivo y de la Asamblea Legislativa y concedía al poder judicial la facultad de determinar omnímodamente qué es un fin público.

Para mí es claro que esa facultad reservada al poder judicial debe ejercitarse con cautela tal que no frustre la responsabilidad y el poder concedido a la Asamblea Legislativa para formular la política pública. El Juez Cooley hace muchísimos años, más de cien, expuso la postura que entiendo debe asumir el poder judicial al definir lo que es "fines públicos" en el caso de *People ex rel. Detroit & Howell Railroad Co.* v. *Township Board of Salem*, 20 Mich. 452, 475 (1870), citado con aprobación por la Corte Suprema de Michigan en *In Re Legislature Request for an Opinion, etc.*, 180 N.W.2d 265, 269 (1970).

"I do not understand that the word public, when employed in reference to this power, is to be construed or applied in any narrow or illiberal sense, or in any sense which would preclude the Legislature from taking broad views of State interest, necessity or policy, or from giving those views effect by means of the public revenues. Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statemanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people."

Véase *P.R. Telephone Co.* v. *Tribl. Contribuciones*, 81 D.P.R. 982 (1960).

Ciertamente no es atribución de este Tribunal determinar si las asignaciones de fondos públicos para fines públicos son sensatas o no. A la comunidad puertorriqueña la agobian innumerables problemas todos los cuales requieren solución inmediata: combatir la criminalidad, aumentar y mejorar las facilidades para la educación de la juventud, mejorar los servicios médicos-hospitalarios, pero no puedo ni debo usar mi posición de Juez para tratar de hacer prevalecer mis particulares preferencias de prioridades de cómo invertir los fondos públicos.

Sin tener que entrar a considerar los alcances de la Sec. 19 del Art. II(1) de la Constitución de Puerto Rico nadie puede cuestionar seriamente la tesis de que cualquier cambio, alteración o modificación al actual *status* político de Puerto Rico tiene que recibir la aprobación del pueblo expresada en un referéndum. El problema con la opinión del Tribunal es que está fundada en una premisa falsa: que la Ley Núm. 102 de 24 de junio de 1977 es una medida para llevar a Puerto Rico hacia la consecución de un *status* político específico. No creo que ése es el propósito de la ley impugnada. Dicho estatuto lo que provee es el mecanismo para que puertorriqueños de todas las tendencias políticas—estadistas, independentistas y autonomistas—puedan participar en la selección de los cuerpos directivos locales de los partidos nacionales, así como sus delegados a las convenciones nominadoras y de programa de gobierno de suerte que puedan tener participación en la selección de candidatos a Presidente y Vicepresidente que se comprometan a concederle a los puertorriqueños la fórmula

---

(1) Dispone así:

"La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo."

de *status* político que prefieran: la estadidad, la independencia o modificaciones al presente *status*.

Por considerar que esto es así, entiendo que la asignación de fondos hecha por la Resolución Conjunta Núm. 17 de 30 de junio de 1978 tiene por propósito un fin público.

—O—

Opinión disidente del Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 5 de octubre de 1978

Disiento de la opinión emitida en el día de hoy en este caso. Yo desestimaría la apelación solicitada por el Partido Socialista Puertorriqueño por razón de que no plantea una cuestión constitucional sustancial. Al unir mi voto al de mis compañeros jueces cuando se expidió la orden que paralizaba el uso de fondos públicos para la celebración de la elección interna del Partido Demócrata de los Estados Unidos en Puerto Rico lo hice por no haberse demostrado por la parte demandada que la fecha fijada era crucial en la celebración de la referida actividad, ni que su suspensión le acarrease daños irreparables, y en vista de que deseaba estudiar la cuestión de derecho planteada con reflexión, detenimiento y mesura, dado el trasfondo político que rodeaba el asunto envuelto. Mi intuición jurídica me indicaba entonces que no debía expedirse la orden de paralización pero los jueces no podemos hacer determinaciones basadas en pura intuición, especialmente si, como dije antes, la fecha no era crítica.

El Tribunal, en una acción sin precedentes, ha sustituido su criterio por el de la Asamblea Legislativa, al tratar de sostener en fútil e inexplicable esfuerzo, lo que considero ser la falsa premisa consistente en que la participación del pueblo en las nominaciones presidenciales de los partidos nacionales de los Estados Unidos tienen el efecto de modificar el destino político final del país y de afectar de modo sustancial las relaciones del Pueblo de Puerto Rico con los Estados Unidos.

El Tribunal pretende apoyar su argumento, en lo que más bien parece ser la construcción de un castillo en el aire, en unas expresiones, a mi juicio irrelevantes a la cuestión planteada, pronunciadas durante las deliberaciones de la Convención Constituyente, al resolver que es contraria a la Constitución del Estado Libre Asociado de Puerto Rico, por infringir la Sec. 9 del Art. VI y la Sec. 19 del Art. II, la Resolución Conjunta Núm. 17 aprobada por la Asamblea Legislativa en 30 de junio de 1978, que autoriza el uso de fondos públicos para sufragar gastos relacionados con las primarias o elecciones internas del Partido Demócrata Nacional a celebrarse en Puerto Rico conforme lo autoriza la Ley Núm. 102 de 24 de junio de 1977 titulada "Ley de Primarias Presidenciales Compulsorias". Jurídicamente no puedo estar conforme con esa determinación por las razones que expondré más adelante.

La controversia planteada por el Partido Socialista Puertorriqueño es al efecto de que la Asamblea Legislativa de Puerto Rico no tiene facultad, bajo la Constitución del Estado Libre Asociado de Puerto Rico "para asignar fondos, ni para envolver a funcionarios públicos del E.L.A. en gestiones y actividades para organizar, administrar y realizar una elección interna de un partido nacional, y específicamente del Partido Demócrata de los Estados Unidos, por ser éste extraño a la vida política del pueblo puertorriqueño y cuya existencia se funda en la elección del presidente y el vice-presidente de los Estados Unidos para ninguno de cuyos cargos públicos se vota en Puerto Rico."

Como remedio a su planteamiento solicita el Partido Socialista Puertorriqueño de este Tribunal "que declare inconstitucional y contrario a derecho la Ley 102 de junio de 1977 [1] y . . . le ordene a los demandados a que cesen y desistan de administrar dicha ley y se abstengan de realizar

---

(1) 16 L.P.R.A. sec. 1301 *et seq.* ("Ley de Primarias Presidenciales Compulsorias").

acto alguno que surja de las disposiciones de ésta, tales como la administración de las primarias presidenciales, la elección interna del Partido Demócrata de Estados Unidos en Puerto Rico y la asignación de fondos[2] del Estado Libre Asociado de Puerto Rico para la realización de éstas."

El Tribunal Superior de Puerto Rico (Negrón Soto, Juez) en una extensa resolución dictada en 7 de septiembre de 1978 sostuvo la constitucionalidad de la Ley de Primarias Presidenciales Compulsorias al declarar con lugar las Mociones de Desestimación presentadas por los demandados y resolver esencialmente que "la Asamblea Legislativa tiene la facultad de aprobar las leyes, fijando la política a seguirse dentro del marco de legalidad y de lo que entiende es el interés del pueblo"; y que "los tribunales están obligados a respetar la voluntad legislativa aun cuando los magistrados pudieren discrepar de su sabiduría."

I

La disposición constitucional que se alega fue objeto de violación lo es la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico que reza así:

"Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley."

El citado precepto constitucional encuentra un lenguaje equivalente en las Cartas Orgánicas de 1900 (Ley Foraker) y de 1917 (Ley Jones). La de 1917 que continúa aún vigente conforme lo dispone la Ley de Relaciones Federales[3] reza así:

". . . podrán imponerse contribuciones e impuestos sobre la propiedad, ingresos, rentas internas . . . cuando dichas contribuciones sean *para los fines de los gobiernos insular y municipal,*

---

(2) Resolución Conjunta de la Asamblea Legislativa de 30 de junio de 1978.

(3) Cap. 446, Art. 4, 64 Stat. 319, 3 de julio de 1950; 1 L.P.R.A.

respectivamente, y se impongan según las disposiciones y prescripciones de la Asamblea Legislativa de Puerto Rico . . . ." (Bastardillas nuestras.) Sec. 3.

La Ley Foraker también limitaba la imposición de contribuciones e impuestos *"para los gastos de los gobiernos insular y municipal."* (Bastardillas nuestras.) (⁴) Sec. 38, prec. 1 L.P.R.A. Otra disposición relacionada de la Ley Orgánica de 1900 recalcaba el propósito del uso de los fondos del Tesoro al disponer que una vez se hubiere organizado un gobierno civil para Puerto Rico, conforme a esa ley, todo lo recaudado por derechos y contribuciones entraría en el Tesoro de Puerto Rico, destinado al Gobierno de la Isla, *para ser invertido en provecho de la misma,* en vez de ingresar en el Tesoro de los Estados Unidos. No he podido encontrar en el historial legislativo de las Leyes Orgánicas mencionadas ninguna expresión que pueda dar contenido a la frase crítica citada que es común a ambas Leyes Orgánicas.

Pero el hecho de que no estuvieren definidos los conceptos "fines de los gobiernos insular y municipal" y "gastos de los gobiernos insular y municipal", como tampoco quedó definido el de "fines públicos", incorporado luego en la Constitución de Puerto Rico, no le resta facultad a la Asamblea Legislativa para aprobar legislación y asignar fondos para lo que a su juicio constituyere un fin público.

Por otro lado, la Asamblea Legislativa, tiene un poder amplio para legislar que tiene su origen en la Sec. 27 de la Carta Orgánica de 1900 que proveía "[Q]ue todos los poderes legislativos locales concedidos por la presente residirán en una Asamblea Legislativa", y en la Sec. 32 que preceptuaba "[Q]ue la autoridad legislativa estatuída por la presente, se aplicará a todos los asuntos de carácter legislativo que no sean localmente inaplicables. . . ." La Carta Orgánica de 1917 conservó las facultades legislativas mencionadas las que solamente estaban limitadas en la forma que disponía ese cuerpo

---

(⁴) Cap. 191, sec. 38, 31 Stat. 86, 12 de abril de 1900, 1 L.P.R.A.

legal. Secs. 25, 37. Luego la Ley de Relaciones Federales proveyó que al entrar en vigor la Constitución de Puerto Rico quedaría vigente la Sec. 37 de la Carta Orgánica de Puerto Rico que confería amplio poder legislativo sobre materias locales a la Asamblea Legislativa. Ley Pública 600 de 3 de julio de 1950, cap. 446, 64 Stat. 319, art. 4.

En *Puerto Rico* v. *Shell Co.*, 302 U.S. 253 (1937), el Tribunal Supremo federal reconoció que "La concesión de poder legislativo con respecto a asuntos locales, contenidas en la sección 32 de la Ley Foraker, y que continuaron vigentes por virtud de la sección 37 de la Ley Orgánica de 1917, era tan amplia y abarcadora como la podía hacer el lenguaje." Pág. 261. Añadió el Tribunal que "[E]l propósito de la Ley Foraker y la Ley Orgánica [de 1917] fue el de conceder a Puerto Rico un poder pleno para hacer sus propias determinaciones locales, con una autonomía similar a la de los estados y los territorios incorporados." Págs. 261–62. Declaró además que "el efecto de tal concesión fue la de conferir al territorio [de Puerto Rico] muchos de los atributos de cuasisoberanía poseídos por los estados." Pág. 262.

Nadie debe dudar que al conferir el Congreso al Pueblo de Puerto Rico mediante la Ley 600 de 3 de julio de 1950, cap. 446, 64 Stat. 314, la facultad de organizar un gobierno basado en una constitución adoptada por el propio pueblo tuvo el propósito de conceder una mayor autonomía a la Asamblea Legislativa para legislar sobre cualquier asunto que considerase un "fin público".

Esta afirmación queda corroborada al examinar las expresiones vertidas en la Asamblea Constituyente en ocasión de la discusión de la cláusula sobre el uso de fondos públicos. El experimentado legislador, Víctor Gutiérrez Franqui, presumiblemente celoso de la independencia legislativa, se opuso a que se precisara lo que constituían "fines públicos e instituciones públicas" para "evitarnos el peligro de amarrar la situación, como muy bien señaló [el señor Reyes Delgado] ayer,

haciendo definiciones en el texto de la Constitución." El resultado neto de esa discusión lo fue el eliminar de la cláusula propuesta la frase "y no se considerarán instituciones del Gobierno ni fines públicos aquellos que no estén bajo la autoridad e intervención del Gobierno." El hecho de que el Senador Gutiérrez Franqui se hubiese manifestado a favor de dejar la "materia de definiciones, en cuanto a lo que es 'fines públicos e instituciones públicas' al poder judicial, de acuerdo con la expresión y declaración legislativa, inicialmente, al aprobarse una ley y luego por la interpretación que el poder judicial haga de esta constitución, en relación con la legislación que esté interpretando" es precisamente el sostener el principio general reconocido por este Tribunal y por el Tribunal Supremo federal de que "la función de ser intérprete final de la Constitución le corresponde a un solo poder, al Poder Judicial." Ni más ni menos. La opinión de la mayoría, a mi juicio, desnaturaliza el efecto de las expresiones mencionadas al enfatizar que la función interpretativa de este Tribunal en materia constitucional es de mayor amplitud en cuanto a la Sec. 9 del Art. VI relativa a "fines públicos".

Nuestra Constitución solamente está limitada por sus propias disposiciones, por la Ley 600 y por la Constitución de los Estados Unidos. Id., Art. 3; Constitución del E.L.A., Art. I, Secs. 1, 2; Art. II, Sec. 19; Art. III. Una de esas limitaciones lo es la cláusula que provee que "sólo se dispondrá de las propiedades y fondos públicos para fines públicos." ([5])

Al adoptarse la Constitución de Puerto Rico se incorporó en ella la disposición al efecto de que "[S]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado. . . ." Art. VI, Sec. 9. Considerando que la Constitu-

---

([5]) Una limitación similar se impone al Congreso de los Estados Unidos por la Constitución federal al facultarle "para imponer y recaudar contribuciones, derechos, impuestos y arbitrios; para pagar las deudas y proveer para la defensa común y *el bienestar general* de los Estados Unidos." Art. I, Sec. 8, Cl. 1. (Bastardillas nuestras.)

ción del Estado Libre Asociado de Puerto Rico fue objeto de aprobación por el Congreso de los Estados Unidos tenemos que aceptar que la disposición constitucional citada debe ser interpretada conjuntamente con la disposición de la Carta Orgánica de 1917 que quedó vigente y que autoriza la imposición de contribuciones "para los fines de los gobiernos insular y municipal." Esto es, el concepto de "fin público" complementa y ampía la disposición citada de la Carta Orgánica de 1917, y da mayor amplitud a la facultad legislativa para aprobar legislación asignando fondos públicos para "fines públicos" en adición a lo que anteriormente parecía limitarse a "los fines de los gobiernos insular y municipal."

El concepto de "fin público", a falta de definición en la Constitución, ha de ser moldeado por la Asamblea Legislativa que es la rama de gobierno que tiene la facultad primaria de hacer la determinación, por mandato constitucional, estando dicho poder subordinado a la soberanía del pueblo. Su facultad, como he dicho anteriormente, es amplia y abarcadora, siendo sus miembros los representantes directamente electos por el pueblo para ejercer la función legislativa, con todos los medios a su disposición para hacer las determinaciones que correspondan luego de hacer los estudios y consultas de todos los factores envueltos, tales como los beneficios que habrá de derivar el pueblo de las medidas que adopte y previa las deliberaciones entre sus componentes.

El concepto "fin público" y la latitud que tiene la Legislatura para determinar su alcance fue interpretado por primera vez, durante la vigencia de la Ley Jones, por este Tribunal en *McCormick* v. *Marrero, Juez*, 64 D.P.R. 260 (1944) al declarar:

"La Legislatura tiene amplia discreción para determinar qué es ló que constituye un fin público y para tomar aquellas medidas que a su juicio promuevan el bienestar de la comunidad. No es función de los tribunales la de expresar opinión sobre la sabiduría o conveniencia de una medida legislativa. Si ésta contiene elementos de beneficio público y el propósito que se trata de rea-

lizar es de carácter público, la cuestión en cuanto al beneficio que haya de recibir el público debe ser resuelta por la Legislatura y no por los tribunales . . . ." Pág. 267.

Luego, en *P.R. Telephone Co.* v. *Tribl. Contribuciones*, 81 D.P.R. 982 (1960) (Serrano Geyls, J.), al considerar el poder de imposición de tributos que confería la Carta Orgánica de 1917 a la Legislatura y los fines para los que dichas contribuciones habrían de ser utilizadas, concluimos que a la luz del significado lógico y corriente de las palabras usadas, de la gravísima importancia del poder fiscal, de la intención del Congreso "de dotar a Puerto Rico con poderes de gobierno similares a los de un estado, y de la práctica invariable de más de medio siglo, que la frase 'para los fines de los gobiernos insular y municipal' de la sec. 3 de la Carta Orgánica no tiene un significado más estrecho que la frase 'para un fin público', limitativa de los poderes del Congreso y los estados." Págs. 994–995.

Toda vez que la referida disposición de la Carta Orgánica de 1917 ata la imposición de tributos con los fines a que éstos han de dedicarse al ámbito de poder de la Legislatura para imponer tributos queda limitado éste a los fines en que habrán de utilizarse los tributos. La función judicial para revisar, tanto la imposición de contribuciones como los fines a que se destinen, según expresamos en *P.R. Telephone* es extremadamente reducida, y al efecto dijimos:

"A los criterios usuales de autolimitación que guían 'la grave y delicada función' judicial de juzgar la validez constitucional de las medidas legislativas—*E.L.A.* v. *Aguayo,* 80 D.P.R. 552, 595–597 (1958)—se une en este caso la especial circunstancia de que la determinación del legislador tiene por base variados elementos de la política pública cuyo escrutinio está fuera de la competencia de los jueces." Pág. 996.

Allí citamos con aprobación jurisprudencia federal en torno al problema de la discreción legislativa al decir:

"En repetidas ocasiones el Tribunal Supremo federal ha fijado la profundidad de las incursiones judiciales en esta área.

En *Carmichael* v. *Southern Coal Co.*, 301 U.S. 495, 514–515 (1937) el Tribunal explicó que desde la adopción de la Enmienda XIV los estados sólo pueden imponer contribuciones para un fin público y no para propósitos privados, pero que los requisitos del debido procedimiento dejan 'campo libre para el ejercicio de una amplia discreción legislativa al determinar qué erogaciones servirán el interés público.' Esa discreción incluye, desde luego, la asignación de fondos para el 'bienestar general'. 'Las maneras de beneficiar el interés público están peculiarmente dentro del conocimiento de la Legislatura' y 'es a ésta y no a los tribunales a la que corresponde el deber y la responsabilidad de escoger entre los posibles métodos'. Por consiguiente para justificar la intervención de un tribunal se requiere 'un caso claro de desviación de cualquier propósito público que razonablemente pudiera concebirse', o como se dijo en *Helvering* v. *Davis*, 301 U.S. 619, 640 (1937) 'un despliegue de poder arbitrario, no una demostración de juicio'. Y esa autoridad judicial, se añadió en *Everson* v. *Board of Education*, 330 U.S. 1, 6 (1947), debe ejercitarse 'con la más extrema cautela'." 81 D.P.R. págs. 996–997.

También nos referimos allí a lo que constituía "fin público" al expresar:

"El concepto de 'fin público' no es uno estático, atado de por siempre a las ideas que en un momento histórico particular definieron los poderes y responsabilidades del gobierno. Está, por el contrario indisolublemente ligado al bienestar general y, como éste, tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica y los problemas peculiares que éstas crean, y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad democrática altamente compleja. *Helvering* v. *Davis*, supra, pág. 641. Debe recordarse que la 'Enmienda XIV no privó a los estados de su facultad de enfrentarse a problemas que anteriormente habían sido dejados para ser resueltos por los individuos'. *Everson* v. *Board of Education*, supra, pág. 7." Pág. 997.

## II

Establecidas las normas legales y jurídicas discutidas precedentemente examinemos la "Ley de Primarias Presidenciales Compulsorias" y la "Resolución Conjunta de la Asam-

blea Legislativa de 30 de junio de 1978" que asigna fondos para su implementación, a los fines de determinar si la utilización de fondos públicos en la implementación de la primera constituye el uso de fondos públicos para fines públicos que preceptúa la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico.

La Ley Núm. 102 autoriza la celebración de (1) primarias "para la elección de Delegados Nacionales a las convenciones de los Partidos Políticos Nacionales con derecho a nominar candidatos para los cargos de Presidente y Vice-Presidente de los Estados Unidos y de cualesquiera otros oficiales que determinen dichos partidos" y (2) elecciones internas "por un partido político afiliado, o grupo de ciudadanos reconocidos por un Partido Nacional, u ordenada por un Partido Nacional. . . ." Arts. 2 y 3. Tanto las primarias como las elecciones internas han de ser celebradas de acuerdo con las disposiciones de la Ley Electoral de Puerto Rico. Ley Núm. 4 de 20 de diciembre de 1977 (antes Ley Núm. 1 de 13 de febrero de 1974).

La opinión de la mayoría enfatiza, a mi parecer indebidamente, en su razonamiento para combatir el fin público de la Ley Núm. 102 y de la Resolución Conjunta Núm. 17, que dichas leyes propenden a modificar en alguna forma el destino político final del país, o afectar de modo importante las relaciones de Puerto Rico con los Estados Unidos, cuestiones ambas para las que "[L]a Asamblea Legislativa está desprovista de poder" por ser "zonas reservadas al pueblo de Puerto Rico, tales como la relativa al voto presidencial, a menos que el pueblo la autorice expresamente." También recalca que "[L]a agrupación envuelta en este caso . . . favorecida con la asignación de fondos . . . no es un partido político puertorriqueño ni sirve o complementa, dentro de los criterios discutidos, un fin gubernamental."

La tesis de la mayoría parece ser que la participación de los puertorriqueños en el proceso de nominación de los can-

didatos a Presidente y Vicepresidente de los Estados Unidos propuestas por los partidos nacionales equivale a introducir unos cambios en el destino político final del país (*status*), o afectan de modo importante las relaciones de Puerto Rico con los Estados Unidos, lo que requeriría su sumisión al pueblo mediante un referéndum en el que la ciudadanía exprese su deseo. Acepta el Tribunal que para dicho referéndum pueden utilizarse fondos públicos por ello constituir fines públicos.

No logro entender que tal participación en la nominación de los candidatos a Presidente y Vicepresidente de los Estados Unidos, a pesar de haberse llevado a cabo por casi medio siglo, unas veces por partidos políticos puertorriqueños, otras veces por partidos políticos afiliados a los partidos nacionales y otras veces por grupos locales de ciudadanos afiliados a partidos políticos puertorriqueños, haya sido factor aparente de cambio en el *status* político del país, no obstante haber estado envueltos en esos procesos sectores influyentes de los movimientos políticos locales.

Por otro lado, cabe señalar que en las relaciones económicas con los Estados Unidos son evidentes los beneficios alcanzados por Puerto Rico a través de la colaboración con los partidos nacionales, ya que en un momento dado las decisiones del Presidente de los Estados Unidos, de las cámaras legislativas nacionales, y de los varios departamentos y agencias federales pueden ser afectadas por la estrecha colaboración que pueda existir entre los distintos sectores de opinión del país y el gobierno de los Estados Unidos. No puede escapar a la imaginación, para entender el trasfondo de las realidades que sirven de sostén a las relaciones entre Puerto Rico y los Estados Unidos, la importancia extrema de la aportación de este último a la economía del país cuyo efecto es una mejor calidad de la vida para nuestros habitantes traducido en ayudas para proporcionar más y mejor educación, salud, viviendas, empleos, agricultura, fuentes de agua y otras necesidades básicas para el sostenimiento de la sociedad en gene-

ral, y especialmente de las clases pobres y necesitadas de Puerto Rico. Para dar una idea a *grosso modo* del impacto de dichas relaciones debe mencionarse que el flujo de fondos federales a Puerto Rico consistente en la suma de las transferencias netas de pagos del gobierno de los Estados Unidos al pueblo de Puerto Rico junto a las aportaciones del gobierno federal a Puerto Rico durante el año fiscal 1977 ascendieron a $1,978,199,000, lo que constituye el 25% del producto bruto nacional de Puerto Rico de todas las fuentes.[6] La extraordinaria importancia de esa cifra y sus efectos en la economía de Puerto Rico es inescapable. Ese cuadro puede revelar y justificar las consideraciones que tomó en cuenta la Asamblea Legislativa para darle al pueblo una amplia participación en la determinación de los candidatos propuestos para los cargos de Presidente y Vicepresidente de los Estados Unidos por los partidos políticos nacionales con todo el alcance que dicha determinación pueda tener en beneficio de Puerto Rico, que no excluye la posibilidad de que los votos de los delegados puertorriqueños en esas nominaciones pueda tener el efecto de ser decisivo en el resultado de unas elecciones nacionales. A los jueces nos está vedado entrar en esas consideraciones que competen a la Asamblea Legislativa. Como puede verse, no está en juego el destino político de Puerto Rico, ni ningún cambio en las relaciones entre Estados Unidos y Puerto Rico. Para ello, conforme lo decidió el plebiscito de 1967, se requiere la aceptación de la mayoría de los electores votantes en referéndum convocado al efecto. Ley Núm. 1 de 23 de diciembre de 1966, 16 L.P.R.A. sec. 862.

No debe confundir pues el Tribunal la antigua y continua participación de los puertorriqueños en las nominaciones presidenciales, antes y después de la adopción de la Constitución del Estado Libre Asociado, y el derecho potencial al voto

[6] Véase Informe Económico al Gobernador, 1977, Junta de Planificación de Puerto Rico; Balanza de Pagos, Puerto Rico 1977, Junta de Planificación de Puerto Rico.

presidencial que no solamente no está en juego en estos momentos, sino que en el campo de las posibilidades pudiera nunca estarlo. La obtención de tal derecho que requeriría una expresión del pueblo mediante referéndum, sí constituiría una modificación importante de las relaciones de Puerto Rico y los Estados Unidos. Pero no se trata de eso.

Paso a discutir la Ley de Primarias Presidenciales Compulsorias a la luz del amplio poder de la Asamblea Legislativa para determinar que dichas primarias constituyen "fines públicos", y de la deferencia y respeto que debemos a las actuaciones de una rama de igual jerarquía, dentro de nuestro sistema constitucional, si su actuación no es un caso claro de desviación de cualquier propósito público que pueda concebirse.

La Ley de Primarias Presidenciales Compulsorias establece un sistema de primarias presidenciales compulsorias en Puerto Rico, reglamenta las elecciones internas de los Partidos Nacionales y autoriza la adopción de reglamentación de esos efectos. Su Exposición de Motivos dispone:

"El Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico establece como factor determinante de nuestra vida 'la ciudadanía de los Estados Unidos y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas'. Uno de esos derechos es el de nominar candidatos a la Presidencia y Vicepresidencia de los Estados Unidos. Los puertorriqueños han estado participando en las Convenciones Nacionales de los Partidos Nacionales por casi medio siglo. Sin embargo, no ha existido hasta este momento una ley que garantice la más amplia participación de los puertorriqueños, como ciudadanos americanos, en la selección de los delegados que nos representan en las convenciones de los Partidos Nacionales para la nominación de candidatos a la Presidencia y Vicepresidencia de los Estados Unidos.

En el pasado los delegados a dichas Convenciones Nacionales han sido seleccionados mediante el procedimiento conocido como *caucus,* el cual no permite la participación amplia de todos los ciudadanos interesados. Permitir la continuación del sistema de *caucus* para seleccionar los delegados de Puerto Rico a las Con-

venciones Nacionales, frustraría la política pública vigente que tiende a darle al ciudadano la mayor participación posible en los procesos democráticos.

Es, pues, el propósito de esta ley, garantizar al pueblo puertorriqueño la mayor participación en la elección de sus delegados a la convención de los Partidos Nacionales, para nominar los candidatos a Presidente y Vicepresidente de los Estados Unidos por medio del sufragio igual, directo y secreto."

Veamos el trasfondo de la cuestión a los fines de la luz que pueda dar para justificar la actuación de la Legislatura al aprobar la legislación objeto de este recurso. Desde el 3 de diciembre de 1962 está en vigor la Resolución Conjunta Núm. 1 aprobada por la Legislatura para "proponer al Congreso de los Estados Unidos la pronta decisión en forma democrática del status político de Puerto Rico" aplicando los principios expresados en la referida resolución. En ella se solicita del Congreso de los Estados Unidos que exprese la forma en que está dispuesto a acordar el Estado Libre Asociado en armonía con los principios contenidos en la resolución, para que sea sometida dicha fórmula, junto a la fórmula de estadidad federada y la de independencia, a la decisión del pueblo de Puerto Rico, de modo que la solución triunfante quede implantada, o se implante conforme a la voluntad del pueblo de Puerto Rico.

La citada Resolución expresa que los que favorecen al Estado Libre Asociado y los que favorecen la Estadidad Federada son contrarios a la separación de Estados Unidos, y los que apoyan la Independencia la favorecen, en su mayor parte, en amistad con Estados Unidos.

Con respecto a los que favorecen al Estado Libre Asociado expresa dicha Resolución Conjunta que desean el desarrollo máximo de esa forma de *status* en unión permanente con los Estados Unidos, reconociendo, entre otros, el siguiente principio:

"La participación del pueblo de Puerto Rico en los poderes que ejercite el gobierno de Estados Unidos bajo el pacto en aque-

llos asuntos que afecten a Puerto Rico, en medida proporcionada al ámbito de dichos poderes. *Esto podrá incluir, entre otras formas de instrumentar tal participación, el derecho a votar por el Presidente y Vicepresidente de los Estados Unidos.*" (Énfasis suplido.)

Aunque la cuestión del voto presidencial, que ha sido motivo de extensa preocupación en la opinión de la mayoría, no está aquí envuelto, es de rigor comentar sobre el interés que han demostrado en ello varios sectores de opinión del país en el pasado para que su mención en el transcurso del tiempo quede en su justa perspectiva: Debe señalarse que tal derecho es la única medida específica que menciona la Resolución Conjunta Núm. 1.

El procedimiento sobre la consulta solicitada al Congreso mediante la referida Resolución Conjunta fue interrumpido por el establecimiento de una Comisión Conjunta de los Estados Unidos y Puerto Rico(7) para estudiar todos los factores que tuvieren que ver con las presentes y futuras relaciones entre los Estados Unidos y Puerto Rico. Ese *modus procedendi* no afectó la vigencia ni la validez de la ya citada Resolución Conjunta Núm. 1 de 1962.

La Comisión mencionada al rendir su informe recomendó la creación de grupos de asesores ad hoc para estudiar las varias propuestas de mejoramiento o desarrollo del Estado Libre Asociado, o el cambio hacia la Estadidad o la Independencia.(8)

Y, en cuanto al Estado Libre Asociado, sugirió la Comisión que se diera cumplimiento a los principios contenidos en la Resolución Conjunta Núm. 1 de 3 de diciembre de 1962, así como a otras propuestas pertinentes que favoreciesen al Estado Libre Asociado. *Id.*, pág. 16.

---

(7) Ley Pública 88–271, 20 de febrero de 1964 y Ley de la Asamblea Legislativa Núm. 9, 13 de abril de 1964.

(8) Informe de la Comisión de los Estados Unidos y de Puerto Rico sobre el Status de Puerto Rico, agosto de 1966, Supt. of Documents, U.S. Govt. Printing Office, Washington, D.C., pág. 10.

Basado en el Informe de la Comisión se celebró el plebiscito de 1967, autorizado por la Ley Núm. 1 de 23 de diciembre de 1966, en el que se sometieron a votación popular las tres fórmulas de *status* para Puerto Rico, esto es, la Estadidad, la Independencia y la continuación del E.L.A. "con capacidad de crecimiento y desarrollo." El resultado del plebiscito forma parte de la historia.

Varios años después el Presidente de los E.E.U.U. y el Gobernador del E.L.A. siguiendo la recomendación de la Comisión de 1966 nombraron conjuntamente un grupo asesor ad hoc para "estudiar la viabilidad de hacer extensivo a nuestros ciudadanos en Puerto Rico el derecho a votar por el Presidente y el Vicepresidente de los Estados Unidos" el que sometió un informe recomendando la celebración de un referéndum para determinar si la mayoría del electorado en Puerto Rico desea votar por los candidatos a la Presidencia y la Vicepresidencia de los Estados Unidos. [9] La recomendación del referéndum se basó en uno de los principios básicos aprobados en el Plebiscito de 1967: "que ningún cambio en las relaciones entre Estados Unidos y Puerto Rico habrá de tener efecto a menos que antes reciba la aceptación de la mayoría de los electores votantes en referéndum convocado al efecto." *Id.* Expresa el Informe que si la mayoría de los electores votantes se expresan a favor del derecho a votar por el Presidente y el Vicepresidente de los Estados Unidos se recomienda que el Gobernador y la Asamblea Legislativa del E.L.A. soliciten al Presidente y al Congreso que tomen la acción pertinente para asegurar el ejercicio de este derecho.

El último Comité Ad Hoc sobre el Desarrollo del Estado Libre Asociado de Puerto Rico recibió la encomienda, entre otras, de considerar la recomendación del anterior Comité Ad Hoc sobre el voto Presidencial para Puerto Rico, y adoptó la siguiente resolución:

---

[9] Informe del Grupo Asesor Ad Hoc Sobre el Voto Presidencial para Puerto Rico, 18 de agosto de 1971, pág. 1.

"En cuanto al derecho de votar en Puerto Rico por los candidatos a Presidente y Vicepresidente de los Estados Unidos este Comité Ad Hoc suscribe la recomendación del Comité previo al efecto de que se consulte al electorado de Puerto Rico directa y separadamente sobre esta forma de participación, no más tarde de un año después del referéndum sobre el Pacto, pero en ningún caso más tarde del año 1979."

Un examen de la Ley de Primarias Presidenciales Compulsorias no revela propósito alguno de promover el voto presidencial al cual no tienen derecho los puertorriqueños, ni dentro del proceso electoral puertorriqueño ni dentro del norteamericano. La referida ley se limita a reconocer en su Exposición de Motivos que los puertorriqueños por casi medio siglo han tenido participación en el proceso de nominación de los candidatos a Presidente y Vicepresidente de Estados Unidos postulados por los partidos nacionales. Ello ha sido así por voluntad de los partidos nacionales que tradicionalmente han dado esa oportunidad a los ciudadanos de los territorios y posesiones de los Estados Unidos. Podemos tomar conocimiento judicial de la declaración de la Exposición de Motivos al efecto de que la representación de los puertorriqueños en ese proceso no ha sido adecuada, ya que no ha habido oportunidad de participación amplia de la ciudadanía. La Ley Núm. 102 persigue el de garantizar la mayor participación en la elección interna por medio del sufragio igual, directo y secreto en cada uno de los precintos electorales y reglamentados por la Comisión Estatal de Elecciones en consulta con el Partido Nacional correspondiente. La Ley Núm. 102 permite que en la referida elección participe un partido político afiliado al Partido Nacional correspondiente, o un grupo de ciudadanos reconocidos por un Partido Nacional, u ordenada por un Partido Nacional. Cabe señalar que este proceso no surge de acuerdo, convenio o entendido alguno entre los gobiernos de Puerto Rico y Estados Unidos. La relación establecida es directa con los partidos nacionales y por ello la ley provee que la participación de los puertorriqueños será reglamentada

por la Comisión Estatal de Elecciones en consulta con el Partido Nacional correspondiente.

En este caso el demandante presentó prueba para demostrar que uno de los grupos que habría de participar en la elección interna del 1 de octubre de 1978—Partido Demócrata de Puerto Rico—adoptó una resolución expresando que no habría de participar ni se proponía radicar petición para participar en las primarias presidenciales a celebrarse el 1 de octubre. El tribunal de instancia al responder al planteamiento hecho por el demandante en su memorando en oposición a la moción de desestimación, al efecto de que habiéndose retirado de la dirección interna del Partido Demócrata Nacional, una facción sustancial de uno de los grupos de ciudadanos que habría de participar, resolvió correctamente que aún existía otro grupo reconocido que había presentado una petición para participar conforme lo dispuesto por la Ley Núm. 102. La Ley Núm. 102 no hace obligatoria la participación de todos los grupos interesados sino que da la opción de concurrir a la elección interna a un partido político afiliado, o grupo de ciudadanos([10]) reconocidos por un Partido Nacional u ordenada por un Partido Nacional bajo la reglamentación de la Comisión Estatal de Elecciones en consulta con el Partido Nacional correspondiente. El partido político afiliado o el grupo de ciudadanos que haya de participar deberá cumplir con el requisito de radicación de cierto número de peticiones de inscripción. La no participación de un grupo o facción no invalida la elección interna siempre y cuando que el Partido Nacional lo autorice y cumpla con los reglamentos del Partido Nacional correspondiente.

---

([10]) El concepto de participación de grupos de ciudadanos fue utilizado antes en la Ley de Plebiscito de 1967 que reconocía partidos políticos y comités directivos de ciudadanos que apoyaran una de las fórmulas de *status* en los casos de abstención electoral de algún partido que hubiese acordado participar y luego decidiese no hacerlo. Ley Núm. 1 de 23 de diciembre de 1966, 16 L.P.R.A. sec. 844 *et seq.*, esp. sec. 847.

Un análisis de los antecedentes relatados precedentemente demuestra que durante muchos años los puertorriqueños han estado interesados y han tomado parte, aunque no con toda la amplitud que pudieren algunos desear, en participar en aquella parte de los procesos electorales de los Estados Unidos que nos son asequibles, y en los que se puede participar sin requerir legislación federal ni enmienda constitucional al efecto. Tal actividad está evidentemente saturada de interés público y así ha sido reconocido por la Asamblea Legislativa al proveer la mayor participación de la ciudadanía en lugar de que tal función quede relegada a grupos pequeños que no necesariamente representan el sentir del pueblo puertorriqueño. La asignación de fondos para ese propósito está dentro de la amplia facultad legislativa de determinar lo que constituye un fin público y de asignar los fondos razonables que fuesen necesarios para realizarlo.

En mérito de lo expuesto desestimaría la apelación[11] instada por el Partido Socialista Puertorriqueño por el fundamento de que no plantea una cuestión constitucional sustancial, y en su consecuencia dejaría sin efecto la orden dictada por este Tribunal en auxilio de su jurisdición de 21 de septiembre de 1978 que paralizó el uso de propiedad pública

---

[11] Debe señalarse que el recurso de apelación instado por el Partido Socialista Puertorriqueño no cumple ni procesal ni sustantivamente con los estrictos requisitos exigidos tradicionalmente por este Tribunal para considerar cuestiones constitucionales. Para empezar, las leyes se presumen constitucionales y el promovente debe poner a los tribunales en condiciones de resolver mediante la presentación de la prueba que sostengan los hechos alegados, y luego la exposición de los argumentos jurídicos en que basa su contención de inconstitucionalidad, incluyendo la mención específica de las disposiciones constitucionales envueltas, y los precedentes jurídicos en que apoya su señalamiento. No hemos podido encontrar que se haya cumplido sustancialmente con dichos requisitos, ni en el tribunal de instancia en el que no se celebraron vistas, sino que se dispuso del caso mediante moción de desestimación; ni ante este Tribunal. El corto escrito de dos páginas presentado ante nos, junto a algunos de los escritos presentados al Tribunal Superior, con la súplica de que se le eximiera de presentar alegato, no satisface a mi modo de ver los requisitos de apelación cuando se plantea una cuestión constitucional.

y de fondos públicos (¹²) para sufragar los gastos relacionados con las elecciones internas del Partido Demócrata Nacional.

---

(¹²) En muchos estados la Constitución exige específicamente que las contribuciones sean para "un fin público". Véanse McAllister, *Public Purpose in Taxation*, 18 Calif. L. Rev. 137, 138 (1929); *Notes and Comments*, Washington 1952, pág. 104. Sobre lo que constituye un "fin público", véanse en general, Judson, *Public Purposes for Which Taxation is Justifiable*, 17 Yale L.J. 162 (1908); McAllister, *op. cit.*, supra; Bergman, *The Federal Power to Tax and to Spend*, 31 Minn. L. Rev. 328 (1947). 15 McQuillin, *Municipal Corporations*, sec. 43.31 (3rd ed. 1950); Note, *The Public Purpose of Municipal Financing for Industrial Development*, 70 Yale L.J. 789, 795 (1961); Note, 108 U. Pa. L. Rev. 95, 109 (1959); Note, *Requirement of Public Use for Expenditure of Public Funds*, 28 U. Pitt. L. Rev. 329 (1966).

## APENDICE DEL COMPILADOR
## A LA OPINION DEL
## TRIBUNAL

RESOLUCIÓN

San Juan, Puerto Rico, a 21 de setiembre de 1978

Plantea este recurso esencialmente si el uso de fondos y propiedades públicos para las elecciones internas de un grupo de ciudadanos afiliados a un partido de los Estados Unidos viola o no la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico.

Oídas las partes en vista oral y examinados el expediente y los alegatos, el Tribunal reconoce la existencia de una cuestión constitucional substancial que requiere sereno y detenido estudio antes de llegar a una decisión. Considerando que la fecha señalada para la elección interna del 1ro. de octubre de 1978 no fue fijada por ley ni se nos ha demostrado que su posposición afectaría los propósitos de la Ley Núm. 102 de 24 de junio de 1977, el Tribunal, en auxilio de su jurisdicción y por el tiempo que tome la decisión de este recurso, prohíbe el uso de propiedades y fondos públicos y la intervención de la Comisión Estatal de Elecciones, del Administrador General de Elecciones y de todo otro funcionario o empleado del Estado Libre Asociado de Puerto Rico en la promoción, administración, dirección y celebración de la referida elección interna.

El ámbito de esta prohibición provisional incluirá la utilización por persona alguna de cualquier propiedad adquirida o por adquirir con fondos públicos.

Lo acordó el Tribunal y certifica el señor Secretario.

(Fdo.) Ernesto L. Chiesa

*Secretario*

—0—

RESOLUCIÓN

San Juan, Puerto Rico, a 27 de setiembre de 1978

Vista la moción radicada por la parte demandada el 25 de septiembre de 1978, el Tribunal hace constar que la Resolución emitida en el presente caso el 21 de setiembre del corriente no se extiende al uso de las escuelas públicas autorizado por la Ley Núm. 94 de 30 de junio de 1975, 18 L.P.R.A. sec. 126a. Véanse: Comisión de Derechos Civiles, *El Uso Fuera de Horas de Clase de Edificios Escolares Públicos para Actividades y Reuniones de Agrupaciones Políticas*, 38 Rev. Jur. U.P.R. 71 (1969); 27 *Op. Sec. Just.* 205 (1956); 33 *Op. Sec. Just.* 31 (1962).

Lo acordó el Tribunal y certifica el señor Secretario.

(Fdo.) Ernesto L. Chiesa
*Secretario*